A. Goldmark & Sons Corp. *v.* United States

No. 6225.—Invoices dated Lisbon, Portugal, April 10, 1939, etc.
Certified April 11, 1939, etc.
Entered at New York, N. Y., April 27, 1939, etc.
Entry No. 28041, etc.

Second Division, Appellate Term

(Decided October 16, 1945)

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for the appellant.
*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the appellee.

Before Tilson, Kincheloe, and Lawrence, Judges

Tilson, Judge: This application for review involves the proper dutiable value of certain sardines imported from Portugal between April 1 and September 1, 1939, and entered at the port of New York. In the first four appeals the merchandise was entered at the list prices, less 10 per centum discount, and was appraised as entered. The merchandise covered by the fifth appeal was entered at list prices, less 15 per centum discount, and was appraised at list prices, net.

During the trial of the case before the court below, counsel for the Government made the following statement regarding the issue and the contention of the Government:

The merchandise was appraised on the basis of export value. In the first four cases; that is, in the first four cases, and the collector having received information that a higher value existed abroad, appealed to reappraisement. In the fifth case, the appraisement was made on the basis of the foreign value contended for by the Government, and the importer appealed, contending for his export value.

When the cases were called for trial in the court below the five appeals were consolidated and it was agreed that the evidence introduced should apply to all five appeals without regard to the appellant or the order in which the evidence was introduced.

In view of the provisions of section 501 of the Tariff Act of 1930 which provide that:

* * * The value found by the appraiser shall be presumed to be the value of the merchandise. and the burden shall rest upon the party who challenges its correctness to prove otherwise.

the Government was required to assume the burden of proving that the values found by the appraiser in the first four appeals were incorrect, and the importer was required to assume the burden of proving that the values found by the appraiser in the fifth appeal were incorrect.

The trial court appears to have completely disregarded the admission of the Government as to the first four appeals that the entered values were the export values, and also appears to have disregarded the contention of the Government that the foreign value was higher than the export value, holding that the foreign value was lower than the export value by the amount of an export tax. The trial court concluded its opinion as follows:

* * * Accordingly, I hold the list prices set forth on the schedule attached to the special agent's report, exhibit 1, and the affidavit, exhibit 13, to be the prices at which the sardines in question were freely offered to *all purchasers* within the meaning of that statutory term, section 402 (c) and (d), *supra*, for appraisement purposes. While such prices were applied to both export and home market sales, they were fixed primarily for the export market, and therefore included certain charges, particularly an item of export tax, for which allowance was made when the goods were sold for home consumption. The effect was to give the purchaser in the Portuguese market a lower price.

On the basis of the foregoing, I hold export value, section 402 (d) of the Tariff Act of 1930 * * * to be the proper basis for appraisement of the instant merchandise, and that such values therefor are the following basic prices set forth, and identified by the importer, on the official list hereinabove referred to:

It should be noted in passing that although the Government admitted as to the first four appeals that the entered values were the export values, and contended that there were foreign values for the sardines which were higher, it failed to file any assignment of error

to the court's finding to the contrary. This state of the record leaves the Government in the position of practically admitting that the entered values represent the correct export values.

In its review of the evidence the trial court points out that it found 63 sales were made which covered merchandise exported to the United States. The trial court further states:

\* \* \* Of the export sales, 54 were at discounts ranging from 5 to 20 per centum, and 9 were at the basic list prices. The 9 sales in which no discount was granted included 1, under date of August 31, 1939, to the importer of the shipments in question from Algarve Exportador, Ltd., one of the exporters of the instant merchandise, and 3 to Calderon & Co., a partner of which company appeared herein as importer's witness, whose testimony is reviewed later.

Examining the special agent's report, exhibit 1, we find the following with regard to export sales and prices:

The manufacturers have sold in the American market during the past year at list prices less discounts ranging from 10% to 20%. Since the outbreak of hostilities in September prices have skyrocketed until today no manufacturer will accept orders at less than 40% to 50% above list.

As to the sales for export to the United States made at list, net, which included, as found by the trial court "The 9 sales in which no discount was granted" we find the following in the special agent's reports. The special agent's report, exhibit 4, shows:

Consular Invoice No. 400, April 3, Meyer & Co., N. Y., List, Net
Consular Invoice No. 799, July 24, Kaufman's, Pittsburgh, List, Net

The special agent's report, exhibit 5, shows the following without giving any consular invoice number:

Aug. 31 Goldmark & Sons, N. Y., list, net

The special agent's report, exhibit 7, shows the following:

Consular Invoice 458, April 15, Strohmeyer & Arpe Co., New York, list, net
Consular Invoice 821, July 26, R. Gerber, Chicago, 16 shillings (18/9), net
Consular Invoice 870, August 9, Calderon & Co., New York, $2.60 (79.25 Escudos), net
Consular Invoice 974, August 30, Calderon & Co., New York, $2.60 (79.25 Escudos), net

The special agent's report, exhibit 9, shows the following:

Consular Invoice 535, May 8, Calderon & Co., N. Y., List, Net

Special agent's report, exhibit 10, shows the following:

Cons. Inv. 466, Apr. 17, Ricossa, Detroit, list, net

Immediately preceding the tabulation of the nine invoices set out above, there appears in the special agent's reports the following:

The following prices have been quoted on shipments made since April 1, 1939.

The record contains no evidence tending to show the quality or brand of the sardines covered by the above nine quotations at list, net.

Consequently there is nothing before us to indicate that the sardines covered by the nine quotations were such or similar to the sardines involved in this application for review. This is also true with reference to the remaining 54 reported offers, referred to by the trial court, at discounts ranging from 5 to 20 per centum. In the absence of some evidence tending to show that the merchandise covered by the nine reported offers for sale, set out above, was such or similar to that here involved, such reported offers for sale can be given no weight in determining the value of the sardines covered by this application for review. In giving weight to such evidence and in finding therefrom that the value of the instant sardines was list, net, the trial court was clearly in error.

Furthermore, there is a complete absence of any showing on the part of the Government that the tabulation of sales in the special agent's reports were made in the ordinary course of trade, or that the merchandise was freely offered for sale to all purchasers in the principal markets of the country of exportation. In this connection it should be remembered that as to the first four appeals the Government assumed the burden of establishing all the elements of value required by section 402, Tariff Act of 1930. Since the record shows that the price did not vary according to the quantity purchased there is no question of usual wholesale quantity presented in this application.

Counsel for the importer offered the testimony of two exceptionally well-qualified witnesses, whose testimony establishes that the sardines covered by this application were freely offered for sale and sold to all purchasers in the principal markets of the country from which exported, in the ordinary course of trade, for exportation to the United States, at the list prices shown on the schedule attached to the special agent's report, exhibit 1, less from 10 per centum to 20 per centum, and that the foreign value was not higher.

In addition to the oral testimony, counsel for the importer offered nine affidavits which were received in evidence and marked exhibits 13 to 21, inclusive. The affiant in exhibit 13 states that:

I hold the position of Director and Partner in the firm of Algarve Exportador, Ltd., of Alcáutara-Mar, Lisbon, Portugal. I have held this position for 21 years, including the period from April 1, to and including September, 1939.

* * * During all of said period Lisbon has been the principal market in Portugal for the sale at wholesale of sardines in tins both for domestic consumption in Portugal and for exportation to the United States. During all of said period I personally was engaged in selling sardines in tins on behalf of my company, both for domestic consumption and for export to the United States. I am familiar with the market conditions in the principal market both with respect to domestic sales and sales for exportation to the United States, and with respect to the different types of sardines in tins sold in such markets in the ordinary course of trade. It has been a necessary part of my business to be familiar with these matters. * * * *

* * * * * * *

In the ordinary course of trade in the principal market of Portugal, during the above period as well as at other times, the tinned sardines usually sold at whole- sale for domestic consumption in Portugal are of a different description from those usually sold in the ordinary course of trade for exportation to the United States. * * *

* * * * * * *

During the period from April 1, to and including September, 1939, my company made sales of canned sardines freely and regularly in usual wholesale quantities in the Portuguese home market for domestic consumption at a price at least 10% below the minimum prices shown on the price list of the IPCP (Portuguese Pre- served Fish Institute) dated June 9, 1938. These sales were made in accordance with the provisions regarding such sales contained in IPCP Circular No. 261, dated October 21, 1935.

The above affidavit also contains a list of sales made to American importers, in each of which there is shown a discount of 10 per centum from the list prices.

In the affidavit, exhibit 14, the affiant states:

That during the period beginning April 1st, and ending September 6th, 1939, the firm Feu Hermanos made sales of canned sardines freely and regularly in the Portuguese home market at a discount of 12% below the minimum prices shown on the price list of the IPCP * * * dated June 9th, 1938.

The other seven affidavits are couched in language similar to that quoted above, all of which show that the prices in the home market, or the foreign values, were not higher than those for exportation to the United States.

The Government offered the testimony of the special agent who made the reports in evidence herein, concerning which the trial court stated:

* * * Substantially all of the Government's evidence is embodied in the remaining 11 reports, the oral testimony of the customs agent adding nothing thereto.

It is observed, however, that the customs agent testified regarding the American Colony in Portugal as follows:

DIRECT EXAMINATION:

* * * * * * *

Q. How many Americans are in the American Colony in Portugal, approxi- mately?

* * * * * * *

The WITNESS: I would say two thousand or more.

* * * * * * *

CROSS-EXAMINATION:

* * * * * * *

X Q. * * * Now you spoke about the American Colony there being about a thousand people there. How much investigation did you make to find out the number of Americans in the American Colony?—A. I didn't make any investigation. That information came to me through talking with members of the Embassy and the Consulate.

It should be stated, however, that when the witness was later interrogated as to whether or not the statements in his reports, in evidence herein, were based upon assumptions and without any investigation, as were his statements regarding the American Colony, he replied in the negative.

As shown by the decision of the trial court, it accepted the tabulation of sales in the special agent's reports as against the sworn testimony of two well-qualified witnesses. With reference to a very similar situation our appellate court, in *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, held as follows:

Accepting the uncertified law of Cuba and the report of the special agent as evidence, it can not be said that they impeach the sworn declaration of the witness for the importer who testified that there was very little difference in the prices quoted by Cuban dealers for the merchandise imported and that the importer cabled each time for prices and received a discount from such prices of 5 per cent and 3 per cent.

After carefully considering all of the evidence presented in this application we find that the weight thereof establishes that the proper dutiable export values of the sardines here involved are in each instance the entered values, and that there were no higher foreign values.

We, therefore, find as matter of fact:

1. That the merchandise involved in this application for review consists of sardines imported from Portugal between April 1 and September 1, 1939, and entered at the port of New York.

2. That Lisbon, Portugal, was the principal market for the sale of such merchandise during the period here involved.

3. That the price did not vary according to the quantity purchased.

4. That the list attached to exhibits 1 and 13 constitutes the official price list promulgated by the Institute Portuguese de Conservas de Peixe, commonly referred to as the I. P. C. P., from which price list all deductions were made in order to arrive at the selling price.

5. That the price at which this merchandise was freely offered for sale, and sold, to all purchasers in the principal markets of the country from which exported, in the ordinary course of trade, at or about the dates of exportation was, in each instance, the entered value.

We, therefore, conclude, as matter of law:

That the proper dutiable export values of the sardines involved in this application for review were the entered values, and that there were no higher foreign values. The judgment of the trial court is accordingly reversed. Judgment will be rendered accordingly.