(Reap. Dec. 9910)

CONTINENTAL FORWARDING, INC. *v.* UNITED STATES

Entry No. 711268.

(Decided February 3, 1961)

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Joseph F. Donohue* of counsel) ; *Barnes, Richardson & Colburn* (*Hadley S. King* of counsel) ; *Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) ; *John D. Rode* (*Ellsworth F. Qualey* of counsel) ; *Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) ; and *Julius Rosen* for the plaintiff.

· *George S. Leonard,* Acting Assistant Attorney General (*Samuel D. Spector* and *Richard E. FitzGibbon,* trial attorneys), for the defendant.

OLIVER, Chief Judge: This appeal for reappraisement relates to certain binoculars exported from Tokyo, Japan, in June 1958 and entered at the port of New York. The items in question with the invoice (entered) prices, which plaintiff claims are the proper dutiable values, and the advanced values adopted by the appraiser, are set forth in the following tabulation:

| Invoice description | Claimed value (invoice price) | Appraised value |
| --- | --- | --- |
| 6 x 30 ZCF [binoculars]_____ | $6.35 | $7.50 |
| Pigskin Case for the above_____ | 0.85 | 0.85 |
| 8 x 30 ZCF [binoculars]_____ | 7.25 | 7.95 |
| Pigskin Case for the above_____ | 0.85 | 0.85 |
| 7 x 35 ZCF [binoculars]_____ | 7.25 | 8.60 |
| Pigskin Case for the above_____ | 0.90 | 0.90 |

The appraised values are prices for these bonoculars set up by the Ministry of International Trade and Industry, hereinafter referred to as "MITI," an agency of the Japanese Government, established under authority derived from a cabinet order, issued pursuant to the Foreign Exchange and Foreign Trade Control Law. The purpose of that law, stated in chapter I, article 1, thereof, is as follows:

The purpose of this Law is to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper develop-

ment of foreign trade and for the safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

Chapter VI of the law relates to "FOREIGN TRADE." Provisions thereof, relevant to this case, are as follows:

(Principle of export)

Article 47. Export of goods from Japan will be permitted with the minimum restrictions thereon consistent with the purpose of this Law.

(Approval of export)

Article 48. Any person desiring to export goods from Japan may be required to obtain the approval of the Minister of International Trade and Industry for those types or areas of destination of export goods and/or method of transactions or payments as provided for by Cabinet Order.

2. The restrictions provided for by Cabinet Order specified in the preceding paragraph shall be within the limit of necessity for the maintenance of the balance of international payment and sound development of international trade or national economy.

(Certification of payment method)

Article 49. The Minister of International Trade and Industry may by ordinance require from any person desiring to export goods an adequate certification that satisfactory payment is provided as provided for by Cabinet Order.

Counsel for the respective parties supplied copies of the Japanese laws, rules, and regulations applicable to the exportation of binoculars, such as those involved herein (plaintiff's collective exhibit 4 and defendant's collective exhibit A–1 to A–5, inclusive).

The program of the Japanese Government governing price control, which gives rise to the present case, was involved in *United States* v. *Baar & Beards, Inc.,* 46 C.C.P.A. (Customs) 92, C.A.D. 705. The conclusion therein, sustaining the appraised values, was based on the record evidence. In this case, plaintiff has approached the issue along a line different from that pursued in the *Baar & Beards, Inc.,* case. The principle of *stare decisis* does not apply.

The parties herein have agreed that appraisement of the present merchandise was on the basis of export value and that the values claimed by plaintiff are "based on the export value." (R. 17.) Statutory export value, as defined in section 402(b) of the Customs Simplification Act of 1956 (70 Stat. 943), which is controlling herein, reads as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental

to placing the merchandise in condition, packed ready for shipment to the United States.

There was admitted in evidence binoculars with leather case as representative of the item identified on the invoice as "6 x 30 ZCF" (plaintiff's collective illustrative exhibit 1).

At a pretrial conference, counsel for the respective parties stipulated that "the Tokyo-Yokohama area is the principal market of Japan for the sale of binoculars such or similar to Plaintiff's Exhibit 1," that "in making sales of binoculars such or similar to Plaintiff's Exhibit 1 the price did not vary in any way by reason of a quantity purchase," and that "sales of binoculars such as or similar to Plaintiff's Exhibit 1 were made to anyone who wished to purchase for exportation to the United States without any restrictions as to use, disposition, resale price, territory in which it might be resold, or in any other respect whatsoever." (R. 10–11.)

The effect of the foregoing stipulated facts leaves for determination herein, in finding dutiable export value, the price of binoculars, such as or similar to the items in question, "in the ordinary course of trade," which statutory phrase is defined in the Customs Simplification Act of 1956, *supra*, section 402(f)(2), as follows:

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

Plaintiff called four witnesses in presenting its direct case. Following is a review in detail of the testimony of each.

The executive vice president of the Peerless Camera Stores, Inc., stated that, at the time of exportation of the present merchandise, his duties included the importation from Japan of binoculars of the sizes involved herein. His testimony is an explanation of the procedure followed in Japan for the exportation of merchandise, such as or similar to the binoculars in question, over a period of years when the witness was engaged in such transactions. An "AGREE-MENT," dated July 9, 1958 (plaintiff's exhibit 2), is a contract executed by the witness, representing Peerless Camera Stores, Inc., and the Fuji Trading Co., Inc., the supplier, showing that Peerless Camera Stores, Inc., agreed to purchase several items of binoculars of various sizes, including those under consideration. Two sets of prices are set forth therein. The lower prices appear under the heading, "Net Price," and are hereinafter referred to as "contract prices." The higher amounts are listed under the designation, "Check Price," which are the "MITI" prices for the different items. The difference between the contract price and the "MITI" price was paid in Japanese yen to the witness' agent in Japan, who then issued to

the Japanese supplier an "approval certificate," which is in the nature of a confirmation of the purchase of the merchandise. The amount of Japanese yen received by the American importer or his agent is available for use in Japan for any purpose, except the purchase of "MITI" merchandise. The witness stated that he used funds so acquired for development work and living and traveling expenses in Japan. Following negotiations that resulted in the execution of the agreement, exhibit 2, *supra*, Peerless Camera Stores, Inc., the American importer, opened a letter of credit in American dollars equal to the total amount of the "MITI" prices for the merchandise. Such a letter of credit was required under the rules and regulations of the Ministry of International Trade and Industry in order to obtain an export permit, allowing for the shipment of the merchandise from Japan. Before the Japanese supplier of the merchandise can draw on the letter of credit, there must be submitted to the bank in Japan the approval certificate issued by the purchaser, an on-board bill of lading, and the export permit.

The witness testified that the method of payment and the procedure followed in obtaining the merchandise covered by the agreement, exhibit 2, *supra*, are representative of the practice followed by him over a period of 5 years, that throughout the period market prices were stable, and that offers of sale for binoculars, like those in question, were received from a number of other firms, which included the Oriental Trading Co., Orient Trading, Central Housewares, and Eiko Kokei, all of whom are located in Tokyo.

Plaintiff's second witness was the president of the Scope Instrument Corp., an importer of precision instruments. The witness stated that, since 1953, his duties have included the purchase and importation of binoculars of the sizes in question, which are standard items freely offered for sale to all purchasers throughout the industry in Japan for exportation to the United States. Based upon a personal investigation of the foreign market relating to binoculars, such as those involved herein, the witness testified that the market for these binoculars, at the time of exportation of the shipment in question, was "fairly stable," with variations of "no more than 2 to 3 per cent" (R. 121) and that these items were freely offered for sale to all purchasers for exportation to the United States at the prices which he paid, as set forth in his purchase order (plaintiff's exhibit 6). The witness also produced the commercial invoice (plaintiff's collective exhibit 7) and the consular invoice (plaintiff's collective exhibit 8), which included the items enumerated on the purchase order (plaintiff's exhibit 6). The commercial and consular invoices list more than 50 different items, covering 6 pages, and include binoculars, like those in question, as well as several other items, some of which are not subject to "MITI" prices. Explaining the method or procedure

followed in paying for all of the merchandise covered by the invoices referred to (collective exhibits 7 and 8), the witness testified as follows (R. 115):

We maintain a revolving letter of credit in Japan, and whenever shipments are about to be made, we are notified of the approximate amount that this shipment—that the shipment would be made for, and we transfer through our bank, through the letter of credit, the necessary funds and the letter of credit so the shipment procedure can take place in Japan.

In connection with the transaction covered by the documents introduced in evidence (exhibit 6 and collective exhibits 7 and 8), the witness gave the following explanation:

This shipment covered by Exhibits 7 and 8 contained besides binoculars, a great number of items not under MITI check price control, and therefore they are not MITI check items, and the shipper was able to draw, in spite of the fact that there are binoculars on there, was able to draw a lower amount against the letter of credit.

Every detail of transactions resulting in the importation of these binoculars by the Scope Instrument Co. is handled by its Japanese agent, Yamamoto Merchandise & Co. The purchase order is sent to Yamamoto Merchandise & Co., who arranges for the purchase of the merchandise from the manufacturer and seller. Yamamoto Merchandise & Co. sends all documents to the Scope Instrument Co., who sends the payment for the goods to Yamamoto Merchandise & Co. Specifically illustrating the procedure followed in a transaction involving binoculars, subject to "MITI" prices, the witness produced a set of documents covering 600 ZIFC pilot binoculars, 7 by 35, with pigskin cases. In connection therewith, the witness stated the purchase order (plaintiff's exhibit 9) was sent to the agent who contacted the seller and arranged for the purchase at $7.05 per unit. Identifying the purchase that had been made, the Japanese agent sent to the Scope Instrument Co. a draft invoice (plaintiff's exhibit 10), which "reflects the so-called MITI check price" (R. 143), the commercial invoice (plaintiff's exhibit 11), showing the actual purchase price, and a credit note (plaintiff's exhibit 12), advising the importer of the amount of credit—the difference between the "MITI" and contract prices—received and which is recorded in a "running account" kept by the agent for the American importer. The witness described the bookkeeping transaction of recording the credit received as follows (R. 133):

For the purpose of keeping the books in Japan, and here also the counter books, these conversions are made on a dollar basis, because we trade in dollars. Should I go to Japan, and say for argument's sake there is a balance of a thousand dollars there, and I wish to take this money from the party that has it, I would naturally get yen, because that is the currency of the country.

Credits so received are available to the Scope Instrument Co. for any purpose, except the purchase of "MITI" merchandise. Asked, on

cross-examination, as to when he is advised of a credit to be received on a "MITI" purchase, the witness replied (R. 155) :

About a week to 10 days before the shipment is made, I receive a notification saying on such and such a date we will make such and such shipment, total contract amount, which are the actual purchase prices, and then I receive a note at the same time telling me we will have to draw either more or less to comply with their machinery over there, and I receive either a debit or a credit.

The witness stated that he is concerned only with the amount of the credit and not with the manner through which it is obtained. It appears from the draft invoice (plaintiff's exhibit 10) and the commercial invoice (plaintiff's exhibit 11), covering the transaction explained by the witness, that the unit prices for the binoculars and the cases are the same on both invoices and that the difference in the total amount of $5,040, shown on the draft invoice, reflecting the "MITI" price, and the amount of $4,230, appearing on the commercial invoice, results from a higher buying commission and other charges relating to the transportation of the merchandise from the factory to the port of shipment.

Plaintiff's third witness was the buyer in the import division of the Lafayette Radio-Electronic Corp., whose business includes the importation of electronic and optical equipment. The witness stated that, during the period involved herein, he was in Japan for the purpose of buying binoculars of the sizes in question, at which time he received offers for sale for, or quotations on, such merchandise from "various organizations other than the one or more than we did business with" (R. 163) and that the prices were "relatively stable; within a few pennies of each other they would always quote the same price about." (R. 163.) Referring to an actual purchase of binoculars from Japan, the witness produced a letter addressed to the Radio Wire Television, Inc., from Central Commerce Co., Ltd., of Tokyo, offering for sale certain types of binoculars that are itemized on a pricelist attached to the letter (plaintiff's collective exhibit 13.) The pricelist shows two sets of prices. The higher prices are designated as the "Check Price," identified as the "MITI" price. The lower amounts are characterized as "Our Lowest Price." Purchase was actually made at prices 15 per centum below the "MITI" prices (plaintiff's exhibits 14, 15, and 16). Payment was made through letter of credit issued for the value of the merchandise at the "MITI" prices and "that letter of credit would be cashed upon notification of an amount being credited to our account in Japan that the merchandise was ready for shipment." (R. 172.) The amount of credit received was the difference between the "MITI" prices and the actual purchase prices. The credit was applied to the American importer's account in Japan, and the amount was available for use by the importer for any purpose, except the purchase of merchandise, sub-

ject to "MITI" prices. Credit notes (plaintiff's collective exhibit 17), verifying the procedure, were sent to the importer by Central Commerce Co., Ltd., of Tokyo, who is the Japanese agent that handled all of the details associated with the transaction. Having received authorization to purchase the binoculars, Central Commerce Co., Ltd., contacted the actual seller and prepared the documents necessary to export the merchandise. Payment by the American importer is sent to the Japanese agent. Credit acquired by the American importer through purchase of binoculars at less than "MITI" prices is carried in a "running account" maintained by Central Commerce Co., Ltd., of Tokyo.

Plaintiff's fourth witness was the vice president of the Compass Instrument & Optical Co., Inc., whose importations from Japan include binoculars of the sizes involved herein. This witness, like the previous ones, outlined the procedure followed by his firm in importing binoculars, subject to "MITI" prices. In this connection, the witness identified a purchase of 500 ZCF binoculars, size 8 by 30—one of the specific items in question—at the price of $8.10 per unit, which is $0.70 less than the "MITI" price, shown to be $8.80, with a consequent credit of $350 (plaintiff's exhibit 20), which was used in the purchase of merchandise not subject to "MITI" prices. Describing the method of payment, the witness testified as follows (R. 190):

We had a standing letter of credit for a certain amount, and whenever this letter of credit was used up, we increased it by another flat amount. Payment then was made against this letter of credit.

In all of such transactions throughout the period involved herein, Ishikawa & Co., Ltd., of Tokyo was the exclusive agent for the Compass Instrument & Optical Co., Inc. The Japanese agent purchased all items, prepared the documents required to export the goods, and maintained a running account for the American importer in which all financial details were recorded. For such services, Ishikawa & Co., Ltd., received a commission.

Defendant introduced an affidavit (defendant's exhibit C), executed by the president of the Teikyo Trading Co., Ltd., of Tokyo, who states that his company is engaged in the exporting business and serves "as principal in the sale and exportation to the United States of various types of merchandise including binoculars." The witness testifies that the Teikyo Trading Co., Ltd., obtained contact with American buyers of binoculars through advertisements in Japanese trade magazines that are circulated throughout the United States. The affidavit embodies lists of sales of different kinds of merchandise over the period from May 1, 1958, through August 31, 1958, to the York Cutlery Co., purchaser of the present merchandise. The prices therein for the items under consideration are the values found by the

appraiser, as hereinabove set forth. In further testimony, affiant states that his company, in its usual course of business, served as the seller of the merchandise covered by the sales enumerated in the affidavit and that "Teikyo Trading Co., Ltd., or any member of such firm, has never at any time given, granted, or agreed to grant, any kind of rebate, refund, or credit to York Cutlery Company or to any of its officers or affiliates in connection with its purchases of binoculars."

In rebuttal, plaintiff introduced two affidavits. One of them (plaintiff's exhibit 21) was executed by H. Endo of Tokyo who stated that, between January and July 1958, he was engaged in the sale at wholesale of prism binoculars, and that, during the period, he offered for sale to all purchasers for exportation to the United States binoculars in pigskin cases of the size "7 x 35, CF" at a price of "$8.06 fob incl. case" and that he actually sold such merchandise to the Compass Instrument & Optical Co., Inc., of New York City. Describing the procedure for payment of the merchandise, the witness testified as follows:

In practice, payment for binoculars was made through letter of credit and at the check price for such binoculars which was, at that time, higher than their contract prices. I credited the purchaser with the difference between the check price and the contract price, and such credits were available to him for any purposes and at any time.

The affiant refers to a visit to his place of business by a United States Treasury agent, who was advised that "all sales were made at contract prices below the check price, that in practice no sale was ever consummated at the check price."

The other affidavit (plaintiff's exhibit 22), executed by K. Ishikawa of Tokyo, is substantially the same as the previous one. The witness testified that he sold to the Compass Instrument & Optical Co., Inc., of New York City binoculars, sizes "7 x 35 CF" and "8 x 30 CF," at a price of "$8.10 fob incl. case." He stated further that a clerk in his office took shipping documents to the office of the United States customs representative to show "how the merchandise could be sold at the contract price by price arrangement with the other items, for which no check prices were established," but refused to give the customs representative "any of the copies of the shipping documents."

It should be noted, at this point, that the statement in Ishikawa's affidavit (exhibit 22, *supra*) that he *sold* binoculars to the Compass Instrument & Optical Co., Inc., of New York City is a direct contradiction of oral testimony given by the vice president of that corporation, wherein he stated as follows (R. 192):

Q. What was the relationship between your company and Ishikawa & Co.? What was Ishikawa to you?—A. He was our agent. He is our agent.

Q. What did Ishikawa do as your agent?—A. He purchased all items we are importing for us.

Q. And then did Ishikawa sell these items to you?—A. No, he charged us on a commission basis.

Q. What was the per cent or the amount of the commission?—A. It was most at that time 7 per cent.

Q. Is that commission included in the price of $8.10 to which you referred?— A. It is included.

Plaintiff called as a witness, in rebuttal, the United States customs examiner at the port of New York, whose duties include the examination and advisory appraisement of prism binoculars, rifle scopes, spotting scopes, telescopes, and such classes of articles. The important phase of his testimony, developed on cross-examination, is the disclosure that H. Endo and K. Ishikawa, who executed the affidavits (exhibits 21 and 22, *supra*), are, in fact, buying agents in Japan for the Compass Instrument & Optical Co., Inc., and receive a buying commission for their services in the foreign market. The customs examiner's oral testimony is supported by copies of agreements between the Japanese agents and the American importer (defendant's exhibits D and E).

The record herein has been outlined in much detail to present, as graphically as possible, the procedure that had developed in the foreign market at the time of exportation of the binoculars in question. Important to the present discussion is the fact that Japanese agents acted on behalf of certain American importers in every detail associated with transactions involving these binoculars. The agents bought the merchandise, arranged for shipment thereof, and received payment therefor from the importer. The agents, so far as the record discloses, never acquired possession of the merchandise. The trade pattern was, in effect, a credit arrangement that evidently was beneficial to these American importers. The use of so-called draft invoices to obtain export permits in the class of transactions covered in plaintiff's evidence suggests an unusual method of doing business, not within the purview of the controlling statute herein.

Plaintiff's testimony makes little reference to the sellers and/or manufacturers of binoculars, such as those under consideration. That they occupied a definite category in the course of trade followed in the exportation of this merchandise, is revealed from an examination of the invoice (plaintiff's collective exhibit 8), consisting of 6 pages and listing more than 50 items of merchandise, including articles subject to "MITI" prices, as well as others which are not "MITI" items. On the last page of the said invoice, and following the enumeration of different costs and charges, there are shown, under the caption "Seller's & Maker's Name & Address," 19 Japanese firms located in the principal market for the present merchandise. Without a showing—and it does not appear herein—of the status or relationship that the manufacturers and/or sellers had in the "normal [practice] in the trade under consideration with respect to merchandise

of the same class or kind as the merchandise undergoing appraisement," within the definition set forth in section 402(f)(2) of the Customs Simplification Act of 1956, *supra*, plaintiff's case is deficient in an element of proof necessary to establish the price "in the ordinary course of trade," as contemplated by the statute and as judicially construed. *United States* v. *A. F. Stauff & Co. et al.*, 11 Cust. Ct. 458, Reap. Dec. 5949; *United States* v. *International Forwarding Co., Inc., et al.*, 27 C.C.P.A. (Customs) 21, C.A.D. 56; and *United States* v. *Rodier, Inc.*, 23 C.C.P.A. (Customs) 336, T.D. 48196. Following is a brief reference to each of the cited cases.

In the *A. F. Stauff & Co. et al.* case, this court, referring to the statutory phrase "ordinary course of trade," stated that:

* * * testimony relating only to transactions between a foreign principal and its exclusive United States selling agent, as related by the latter, is not sufficient to establish dutiable value, without a showing that the business of the foreign manufacturer is representative of the usual course of trade followed by others engaged in the manufacture of such or similar merchandise, in the country of exportation.

In the *International Forwarding Co., Inc., et al.* case, *supra*, our appellate court stated as follows:

Had it been shown that the business practice of the exporter was representative of the general business practices of other manufacturers in Germany with respect to sales of such or similar merchandise, we would hold that there was substantial evidence sustaining the conclusion of the trial court and the appellate division that there was no foreign value of the involved merchandise; but there is nothing in the record with respect to the business practices of other manufacturers in Germany, and there is nothing to show that such or similar merchandise was not freely offered for sale in Germany by other manufacturers in usual wholesale quantities at a uniform price, in the ordinary course of trade, without restrictions of any kind.

In the *Rodier, Inc.*, case, *supra*, the Court of Customs and Patent Appeals held that merely showing the trade practices of plaintiff, who was but one of the several manufacturers and sellers of such and similar woolen dress goods to those involved therein, could not be taken as "the sole criterion" but that the "general practice of the trade must be considered."

The three cited cases support the principle that the trade practices of manufacturers and sellers, with respect to the sale and offers for sale of their own merchandise, are important considerations in determining the ordinary course of trade for tariff purposes.

Plaintiff, in its brief, cites the cases of *A. Goldmark & Sons Corp.* v. *United States*, 15 Cust. Ct. 431, Reap. Dec. 6225, and *United States* v. *Biddle Purchasing Co. et al.*, 21 Cust. Ct. 297, Reap. Dec. 7616. Each of those cases involved canned sardines from Portugal. Both of them were controlled by a factual condition which can be summarized as follows. Some 4 years prior to the exportation of the merchandise, there existed in the foreign market an association or

consortium composed of manufacturers and packers of sardines, which was controlled by a semiofficial Government organization. The purpose of the consortium was to stabilize prices in the foreign market. To effect such purpose, it established a pricelist, setting forth minimum prices at which sardines were to be sold throughout the industry. The pricelist was adhered to for a short time, and then the practice of granting discounts developed until, finally, the official minimum prices were ignored and the pricelist became useless, so that, at the time of exportation of the merchandise involved in the two cited cases, the ordinary course of trade was to grant discounts from manufacturers' basic prices. I cannot find anything in either of those two cases which can be applied herein favorably to plaintiff's position. In this case, plaintiff has confined its proof to the dealings in the foreign market between Japanese agents and certain American importers in a trade practice that does not, in my opinion, reflect the ordinary course of trade in the principal market of Japan at the time of exportation of these binoculars.

In citing *United States* v. *Mexican Products Co.*, 28 C.C.P.A. (Customs) 80, C.A.D. 129, plaintiff, in counsel's brief, argues that "the manufacturer of the glassware involved in the cited case was in the same position as the Japanese control authorities in the case at bar namely, in the position of fixing a list price." (P. 17.) In the *Mexican Products Co.* case, the sole issue was whether the manufacturer's list prices, or such prices, less discounts, were the dutiable export value of the merchandise. No comparable issue is involved in this case. Here, we are concerned with the price in the ordinary course of trade in the foreign market at the time of exportation of the present merchandise. The cited case offers nothing toward a proper determination of the present issue.

The case of *Fawcett* v. *United States*, 27 C.C.P.A. (Customs) 372, C.A.D. 113, is also cited to support plaintiff's contention. In that case, the issue related to a tax imposed on the manufacturer or the spinner of flax yarn, which tax was carried to the purchaser of the yarn for home consumption, but was later refunded under certain conditions. Such a market condition has no bearing on the outcome of the present case under my view of the foreign market for the present merchandise.

The values found by the appraiser for the items under consideration are minimum export prices established by the Ministry of International Trade and Industry of Japan, a duly organized governmental agency established pursuant to law. Establishing minimum prices, under conditions conceded by the parties herein, will not preclude a finding of statutory export value. *United States* v. *Michele Diagonale*, 22 C.C.P.A. (Customs) 517, T.D. 47497. The agreement between counsel for the respective parties that the binoculars in ques-

tion were freely offered for sale and sold without restriction of any kind applies to the "MITI" prices, adopted by the appraiser. Under the statutory presumption of correctness that attaches to the values found by the appraiser (28 U.S.C. § 2633), the "MITI" prices, at which the items under consideration were appraised, embody all of the elements within the controlling statutory definition of export value, set forth in the Customs Simplification Act of 1956, *supra*.

Plaintiff, in challenging such values, assumed a twofold burden, stated in *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495, as follows:

By statutory provision Congress has directed that (1) the value found by the appraiser shall be presumed to be the value of the merchandise and (2) the burden shall rest upon the party who challenges its correctness to prove otherwise.

To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect. * * *

Plaintiff, through its evidence adduced herein, has failed to meet its obligation under the requirements stated in the foregoing quotation.

Consideration has been given to all of the cases referred to in the briefs of counsel for the respective parties. Reference herein has been made only to those cases deemed necessary to support the conclusion reached.

On the basis of the present record, and for all of the reasons hereinabove set forth, I find as matter of fact:

(1) That the merchandise in question consists of three items of binoculars, sizes 6 by 30 CZF, 8 by 30 CZF, and 7 by 35 CZF, exported from Japan, in June 1958 and entered at the port of New York.

(2) That such merchandise was freely sold, without any restriction whatsoever, in the principal market of the Tokyo-Yokohama area in Japan, in wholesale quantities, for exportation to the United States.

(3) That the values found by the appraiser for these binoculars are prices set up by the Ministry of International Trade and Industry of Japan, a duly organized governmental agency established pursuant to law.

Accordingly, I hold as a matter of law:

(1) That the proper basis for appraisement of the merchandise in question is export value, as defined in the Customs Simplificaton Act of 1956 (70 Stat. 943).

(2)   That the evidence adduced herein is insufficient to overcome the presumption of correctness (28 U.S.C. § 2633) that is attached to the values found by the appraiser.

(3)   That the statutory export value for the items involved herein is, in each instance, the appraised value.

Judgment will be rendered accordingly.