(Reap. Dec. 8243)

ATLAS TRADING COMPANY *v.* UNITED STATES

Entry Nos. 8154; 9594.

(Decided July 15, 1953)

*Harper & Harper* (*George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the defendant.

EKWALL, Judge: These appeals for reappraisement, consolidated at the trial, involve wool hooked rugs exported from China on March 20, 1940, and May 15, 1940, respectively.

The values pertaining to the merchandise in reappraisement No. 137197–A are as follows:

|  | Invoiced U. S. dollars per sq. ft. | Entered Tientsin yuan dollars per sq. ft. | Appraised U. S. dollars per sq. ft. |
|---|---|---|---|
| "Belmont" quality | $0. 27 | Y $1. 66 | $0. 27 |
| "Beverly" quality | $0. 28 | Y $1. 72¼ | $0. 28 less 12.99% for nondutiable charges |

The values pertaining to the merchandise in reappraisement No. 137805–A are as follows:

|  | Invoiced U. S. dollars per sq. ft. | Entered (under duress) U. S. dollars per sq. ft. | Appraised U. S. dollars per sq. ft. | Claimed F. R. B. dollars per sq. ft. |
|---|---|---|---|---|
| Order 2908 | $0. 39 | $0. 39 | $0. 39 | Y $3 |
| " 2910 | $0. 39 | $0. 39 | $0. 39 | Y $3 |
| " 2881 | $0. 39 | $0. 39 | $0. 39 | Y $3 |
| " 2944 | $0. 28½ | $0. 28½ | $0. 28½ | Y $2. 70 |
| " 2949 | $0. 28½ | $0. 28½ | $0. 28½ | Y $2. 10 |
| Style 128 | $0. 30 | $0. 30 less nondutiable charges | $0. 30 less 7.92% for nondutiable charges | Y $2 plus packing |

Appraisement was on the basis of export value in both cases. No evidence as to foreign value appears in the record, and the parties have confined their arguments to the determination of the proper export value of the merchandise. According to the affidavit of Harry M. Barkovith, one of importer's purchasing agents, such or similar merchandise was not manufactured or sold for home consumption in China but was specially manufactured for export to the United States. I conclude, therefore, that there was no foreign value for the within merchandise.

Plaintiff contends that the entered value in reappraisement No. 137197–A and the claimed value in reappraisement No. 137805–A represent the export value of the merchandise, on the ground that any purchaser was permitted to acquire such or similar merchandise upon payment of those prices in currency converted at the free rate of exchange, provided the goods were held within the limits of North China, but that in order to export the goods it was required by the Japanese authorities, then in occupation of North China, that the merchandise be purchased with currency converted at a rate of

exchange higher than the free open-market rate. Plaintiff claims that there was thus an additional cost upon exportation which was due to an imposed rate of exchange and that such cost is not a part of the dutiable value. Defendant contends, on the other hand, that the appraised values in United States currency are the export values, on the ground that the merchandise was contracted and paid for, as well as invoiced, in United States currency; that that was the ordinary course of trade at the time of exportation; and that, therefore, the rates of exchange in China for United States currency, whether free or otherwise, are not involved in this case.

This case is a retrial of the issues in *Atlas Trading Co.* v. *United States*, 26 Cust. Ct. 652, 661, Reap. Dec. 7989, wherein it was held that:

* * * the excess of money paid by the importer over the "first cost" paid to the Chinese seller or manufacturer and the exaction made or imposed by Japanese governmental authority by means of the link rate foreign exchange system of export and import control is in substance an export tax and that the decision in this case is controlled by the principles of law laid down in *Sternfield* v. *United States, supra,* and *United States* v. *Tadross & Co. et al., supra.*

The court found the facts upon the record there presented to be as follows (pp. 656–657):

* * * The record establishes beyond question, and there is no dispute about the fact, that the wool hooked rugs in question were actually purchased from the Chinese manufacturer by the American buying agent at a freely offered price in Chinese yuan dollars in the ordinary course of trade for exportation to the United States at the prevailing free or open-market currency rate of exchange and that they were paid for by the American importer, the plaintiff herein, at a price in United States dollars converted at a higher or fictitious or arbitrary permissive "link" rate of exchange, i. e., 13⅞ or 14 cents United States currency for each Japanese F. R. B. or Chinese yuan dollar. The record establishes that in such transactions the American buying agent deposited with the Yokohama Specie Bank at Tientsin, by means of cable transfer or through letter of credit, United States dollars in the amount indicated on the invoice, the amount of United States dollars stated on the invoice being an amount equivalent (at the permissive, fixed rate) to the Chinese yuan dollars which the Chinese manufacturer was to receive for the wool hooked rugs. It is established by the record (Tr. 30, 31) that in the transaction involving the rugs in question, the amount of purchase stated in the invoice in United States dollars was $203.43 and that of this sum, the Chinese manufacturer of the rugs received in Chinese yuan or F. R. B. dollars the equivalent of $105.85 in United States currency; that the Japanese Federal Reserve Bank or its agent or branch, the Yokohama Specie Bank at Tientsin, received $20.34 and the balance in Chinese yuan or F. R. B. dollars went to the Chinese importer in Tientsin bringing in goods from the United States and with whom the link transaction had been arranged.

The record in that case has been incorporated herein, and additional evidence has been introduced by both parties.

To understand the issues in this case, the method of doing business in North China in 1940, including the operation of the so-called link

system, must be taken into account. Several of the witnesses described this system, but the fullest and most credible explanation is found in the testimony of Mr. Irving S. Brown, together with the charts and reports prepared by him, which were received in evidence. Mr. Brown, who speaks the Chinese language, had been a member of the Administrative Staff of the Chinese Maritime Customs in Shanghai, China, from 1923 to 1931 and a Treasury representative in Shanghai from 1931 to 1941. In the latter capacity, he became familiar with and made an investigation of the regulations and trading practices in North China in 1940. His testimony is corroborated by other evidence in the record, including an affidavit of Mervin Rothschild, manager of Rieser Co., Inc., in Chefoo, China, from 1930 to 1941; a "Statement Concerning Credit Terms in the Tientsin Consular District," apparently prepared by the American consulate in Tientsin; and the testimony of John J. Waldron, who had been a buying agent for Atlas Trading Company, had had various interests in the rug business in China, and had operated as a link broker in Tientsin from 1939 to 1941.

The following explanation of the link system is derived from this evidence: Prior to the Japanese occupation, the currency in use in North China was Chinese national currency (called C. N. C. or "fapi"). On March 11, 1938, the occupying authorities established an official organ known as the Federal Reserve Bank of China (or North China) and issued a regulation that its notes (called F. R. B. dollars) were to be the sole legal currency in North China. The authorities were never able to enforce completely this regulation, and the two currencies circulated side by side at varying rates of exchange. (The term "yuan dollars" was also used by the witnesses, but Mr. Brown testified that the word "yuan" merely means "round" and that the term "yuan dollar" does not denote any particular kind of dollar. That term, as used in this opinion, refers generally to Chinese currency circulating in North China at the period involved herein, whether F. R. B. dollars or C. N. C. dollars.)

Further regulations provided that all exchanges made through the Federal Reserve Bank of North China were to be consummated at fixed rates of exchange at par with the Japanese yen, although, in fact, on the free market, they were not at par. The fixed rates, insofar as they affected United States dollars, were U. S. $0.23⅝ per F. R. B. dollar when the bank bought United States currency and sold F. R. B. currency, and U. S. $0.23⁷⁄₁₆ per F. R. B. dollar when the bank bought F. R. B. currency and sold United States currency. Export shipments from China were not allowed clearance unless the exporter showed to the Chinese Maritime Customs a certificate that the foreign currency resulting from the sale had been converted through the Federal Reserve bank at the fixed rate of exchange. The exporter or

seller of foreign exchange at the fixed rate was granted the right to buy back 90 per centum thereof, which right was transferable. The Federal Reserve bank was the actual control bank but it did not deal with individuals, and the Yokohama Specie bank acted as its agent.

Under this controlled system, the Chinese exporter would get from the Federal Reserve bank for his United States dollars less than half the number of F. R. B. dollars he could get on the free market. On the other hand, the Chinese importer would pay a less number of F. R. B. dollars for United States dollars at the fixed rate than at the free rate. Therefore, the authorities suggested that if anyone was hurt on exports he could very well make it up on imports, and the operation of applying an excess on imports to make up a deficit on exports resulted in the linking system. Since the same individuals or firms were not usually both exporters and importers, a Chinese exporter who had repurchase rights available would sell them to a Chinese importer who needed them in order to acquire foreign currency to pay for his goods. Sometimes the exporter and the importer got together directly and sometimes through the medium of a broker.

The actual operation of a link transaction was explained by Mr. Brown by means of various charts prepared by him. Assume first a deal by which the American importer pays U. S. $13,875 for goods valued at F. R. B. $100,000. The U. S. $13,875 is exchanged at the official rate (0.23625), and the Chinese exporter receives F. R. B. $58,730.16, plus a repurchase right. He sells the repurchase right to a Chinese importer for F. R. B. $41,269.84, thus obtaining in full F. R. B. $100,000. The Chinese importer uses the repurchase right (for which he has paid F. R. B. $41,269.84), plus F. R. B. $53,280, to buy U. S. $12,487.50 (90 per centum of U. S. $13,875). He has, therefore, paid a total of F. R. B. $94,549.84, and the American exporter has received U. S. $12,487.50. The Federal Reserve bank has received an excess of U. S. $1,387.50 and has paid out an excess of F. R. B. $5,450.16. Converting the U. S. $1,387.50 into F. R. B. dollars at the fixed rate gives F. R. B. $5,872.59, making the profit of the bank F. R. B. $422.43, which appears to be a normal bank profit for exchanging currency. The result of linking the two transactions is a lowering of the actual rate of exchange as follows:

Chinese exporter's link rate:   U. S. $13,875÷F. R. B. $100,000=0.13875.
Chinese importer's link rate:   U. S. $12,487.50÷F. R. B. $94,549.84=0.1320732

In practice, after making the link arrangement, the exporter might deliver U. S. $13,875 to the Chinese importer and receive from him the entire F. R. B. $100,000. The importer would then sell the U. S. $13,875 to the bank and receive F. R. B. $58,730.16, plus the repurchase right permitting him to obtain U. S. $12,487.50 on payment of F. R. B. $53,280.

The above example assumes that the repurchase right was worth enough so that the exporter's link rate of exchange could be calculated at 0.13875. However, this was not always true. The tendency was for the link rights to become more valuable and, accordingly, it became possible to link at lower effective rates. The lowering of the link rates emphasized the existing disparity between the F. R. B. dollar and the Japanese yen and by reducing prices to American importers made less exchange available for purchase, and a smaller amount of United States currency went into the permanent holdings of the Federal Reserve bank. Therefore, the authorities promulgated an additional ruling that when exporters converted exchange they must offer for conversion a minimum amount, computed by taking the F. R. B. dollar cost of the goods exported and applying to that figure the factor of 0.13875. In other words, linking would not be permitted at an effective rate of less than 0.13875. In order to get around this regulation, a practice arose under which the Chinese exporter underdeclared the value of the merchandise to the control bank and received a secret supplement from the Chinese importer for the repurchase right.

In an endeavor to check this practice and to find out the actual value of the merchandise, the control bank required exporters, when applying for export permits, to present their certified consular invoices declaring value. Thus, if the consular invoice showed the true amount of F. R. B. dollars to be received, the exporter would have to present for conversion United States dollars in an amount equal to F. R. B. dollars converted at 0.13875. Therefore, shippers were under the necessity of invoicing in United States dollars. Mr. Brown stated that they were advised by the American consulate and by himself that the way to get an invoice in United States dollars accepted was to do business in that currency.

From all of this, it is evident that the entire amount paid by the American importer (converted at the agreed link rate) was received by the Chinese exporter, although partly through the medium of the sale of the repurchase right to the Chinese importer. No funds paid by the American importer were acquired by the Chinese importer nor by the control bank (except as a normal banking profit on exchange). The example cited by the court in *Atlas Trading Co.* v. *United States, supra,* omits (1) the sale of the repurchase right, through which the Chinese exporter acquires an additional amount over the F. R. B. equivalent of U. S. $105.85 converted at the official rate, (2) the fact that the control bank decreases its holdings of F. R. B. dollars, so that it acquires no more than a normal profit for exchanging currency, and (3) the fact that the Chinese importer must pay not only the amount of F. R. B. dollars required by the control bank for

conversion into United States dollars at the official rate, but also the amount charged by the Chinese exporter for the necessary repurchase right.

In view of the additional evidence presented in this case, I am unable to conclude, as did the court in the *Atlas Trading Co.*, case, that there was any excess money paid by the importer herein which was an export tax under the principles laid down in *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065, and *United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T. D. 41528. The rule as enunciated therein is to the effect that when a tax is imposed upon the merchandise at the time it is exported and does not accrue until that time arrives, it is not a part of the export value, but where an export tax is an element of value in determining the market price, it is a part of the export value. See also *United States* v. *International Commercial Co., Inc., et al.*, 28 Cust. Ct. 629, Reap. Dec. 8112. In all of the cases cited, the item in question was clearly a tax or charge payable to a foreign Government or governmental agency which did not accrue until exportation. The merchandise was or could have been purchased at a price which did not include the item. Upon exportation, it was possible for the tax or charge to be paid by the purchaser or shipper of the merchandise.

In the instant case, there is no particular item which can be called a tax, nor is there any amount which was actually paid to the foreign Government or governmental agency by way of a tax. The facts are that the merchandise was offered for sale for a certain number of yuan dollars. If bought for use in North China, it could be paid for with yuan dollars which had been converted at the free rate. If bought for export to the United States, it must be paid for with yuan dollars which had been converted at the official rate or a link rate. In other words, the export price was in yuan dollars converted at a certain rate of exchange (or the equivalent in United States currency). The rate was established by linking the transaction with another transaction between a Chinese importer and an American exporter. This link was arranged before the purchase of the goods, so that the final price included whatever increase was due to the difference between yuan dollars converted at the free rate and yuan dollars converted at the link rate. It is clear, therefore, that even if the increase be considered a tax, it is not something added to the market price, but is an element thereof. There is no evidence that the merchandise was ever offered or sold for export at a price which did not include a link rate, nor that anyone ever purchased such merchandise in the ordinary course of trade, with yuan dollars converted at the free rate, and then attempted to export that merchandise.

The Japanese regulations may have resulted in higher prices for merchandise bought for export. The requirement that currency be exchanged at the official rate, as originally enacted, resulted in so great a price rise to American importers that without the use of the link system costs would have been prohibitive. In actual practice, therefore, the differential between the price of the merchandise in yuan dollars converted at the free rate and the price converted at the link rate was not so great as was suggested by some of the witnesses. For instance, the free rate on March 20, 1940 (as stated by John C. Townsend, deputy collector in charge of the liquidating division in Los Angeles), was 0.05833 while the link rate (as set forth in a tabulation annexed to Mr. Brown's report of June 30, 1940) was 0.0675 to 0.07. The free rate on May 15, 1940, was 0.04991 while the link rate was 0.05 to 0.055. It is immaterial that the higher price was due to governmental regulations, provided it was "the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States" (section 402 (d), Tariff Act of 1930). In the instant case, it is evident that that price was a price in yuan dollars converted at an agreed link rate or the equivalent in United States dollars. A price in yuan dollars converted at the free rate is hypothetical since no merchandise was offered for export at that price. What the price might have been, had there been no controls, is equally hypothetical.

The merchandise in the instant case was appraised in United States dollars. It is presumed that the appraiser found every fact to exist that was necessary to sustain that appraisement. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 C. C. P. A. (Customs) 146, C. A. D. 75; *White Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. (Customs) 199, C. A. D. 192. It was his duty to find the value of the merchandise in the unit of quantity in which it was usually bought and sold and to express such value in the currency in which it was usually bought and sold in the ordinary course of trade in the country of exportation. Section 500, Tariff Act of 1930; article 776, Customs Regulations of 1937; *United States* v. *Gothic Watch Co.*, 23 Cust. Ct. 235, Reap. Dec. 7712. Therefore, it is presumed that he found that the merchandise herein was usually bought and sold in United States dollars in North China at the time of exportation thereof. The burden of overcoming that presumption rests upon the plaintiff. *Harry Garbey* v. *United States*, 24 C. C. P. A. (Customs) 48, T. D. 48332; *Transatlantic Shipping Co., Inc. (Absorbo Beer Pad Co., Inc.)* v. *United States*, 28 C. C. P. A. (Customs) 19, C. A. D. 118.

In order to meet that burden, plaintiff attempted to establish that the so-called "first cost" of the goods in yuan dollars was the price at which such or similar merchandise was freely offered and sold in the ordinary course of trade in Tientsin, China, at the time of exportation herein.

The affidavit of Harry M. Barkovith, heretofore referred to, states the following in regard to the merchandise involved in reappraisement No. 137197–A:

That the First Cost of said Rugs, that is the price that said merchandise was freely offered for sale to all wholesale purchasers in Tientsin, China in the usual wholesale quantities and in the ordinary course of trade for Exportation to the United States on and immediately prior to February 23rd, 1940 and the Currency of purchase were as set forth in "Schedule A" as follows:

SCHEDULE "A"

| Quality | Feetage | Price per Sq. Ft. | Total |
|---|---|---|---|
| Belmont | 5340 Sq. Ft. | Yuan $1. 77½ | Yuan $9, 478. 50 |
| Beverly | 2089 " " | " $1. 84 | " $3, 843. 76 |
| | 7429 Sq. Ft. | | Yuan $13, 322. 26 |

Mr. Silverman, owner and general manager of Atlas Trading Company, stated, however, that the Belmont quality involved in reappraisement No. 137197–A could be purchased in Tientsin, China, at yuan $1.66 per square foot for export to the United States, in the ordinary course of trade and in the usual wholesale quantities, on the date of exportation thereof, and that the Beverly quality could be so purchased at yuan $1.72¼ per square foot. · It was stipulated that the witness would give the same testimony as to the rugs involved in reappraisement No. 137805–A, except that the prices he would use would be yuan $3, $2.70, $2.10, and $2.

It is apparent that these prices are subject to the qualification that if the merchandise was bought for export, the yuan dollars used to purchase it would have to be yuan dollars which had been converted at the link rate. Mr. Barkovith stated that the transaction was effected on the basis of the link rate of exchange; that, under the regulations, exporters were obliged to link with importers for the purpose of exportation. Mr. Silverman and Mr. Rupert Sewelson, buyer and manager of Atlas Trading Company, stated that while merchandise could be purchased with yuan dollars obtained at the free rate, in order to export, conversion would have to be made in accordance with the Japanese regulations. Mr. Sewelson said that except for one rug which he bought for his personal use, he never made a purchase with exchange obtained at the free rate. Mr. Waldron testified that he was not permitted to use the free rate in carrying on his business.

It is obvious that there could be no market for export for merchandise purchased with yuan dollars obtained at the free rate, since in order to export, it was necessary to present foreign currency to the control bank for conversion at the official rate. Thus, a purchaser who bought at the free rate would have the goods on his hands with no way to export them unless he sold them to some one else and obtained the necessary amount of foreign currency. It is clear, therefore, that the only way in which these goods were bought and sold for export was with currency which had been converted at the agreed link rate of exchange (which was not necessarily the permissive rate).

Therefore, in order to determine the price at which the merchandise was freely offered and sold for export, it is necessary to know not only the stated amount of yuan dollars, but also the agreed link rate of exchange. This the plaintiff was unable to establish. Mr. Waldron was asked to give the "first cost" of the merchandise in reappraisement No. 137805–A in yuan dollars, but could not do so as he could not determine the link rate actually used.

While the plaintiff has failed to establish the value of the merchandise in yuan dollars converted at the link rate, there is substantial evidence supporting the appraiser's finding that the merchandise was bought and sold in United States dollars.

The merchandise herein was invoiced in United States currency. Mr. Silverman testified that the purchases were made in yuan dollars, but added that "ultimately we asked the agent to submit the figure to us in United States dollars, because we did not want to be stuck on the fluctuations in the currency because of the complex link system." Mr. Sewelson stated that the transactions were completed in United States dollars. Mr. Waldron testified that there was a definite price settlement before placing orders; that the arrangement was made in United States currency; and that he was bound to export at the agreed price in United States dollars. He said that it was not possible for him to carry on business by invoicing in F. R. B. dollars, but that he had to invoice in United States dollars; that the only basis upon which he operated was in United States dollars; that he never quoted prices in anything but United States dollars; that any quotations in yuan dollars were for guidance only and did not represent final prices.

In a petition by the importer to the Commissioner of Customs, dated December 19, 1940, it is stated:

Our merchandise has been invoiced for several years in U. S. dollars due to the fact that we could not afford to speculate on the fluctuation in the Chinese exchange for the three or four month period which it takes to manufacture such merchandise. Consequently, we have always insisted that our buying agents advise us of prices in terms of U. S. dollars. * * * Our main concern was to order merchandise at a definite price at which we would make committments [sic] in the United States, without the necessity of speculating on the rise and fall of the foreign currency.

In view of this evidence; it is clear that plaintiff has not overcome the presumption of correctness attaching to the appraiser's valuation of the merchandise in United States dollars. There is no showing that such or similar merchandise was freely offered for sale or sold at the time of exportation in the ordinary course of trade for exportation to the United States at a price different from the appraised value, whether in United States dollars, F. R. B. dollars, or any other currency. The appraised values must, therefore, be affirmed.

Upon the record presented, I find as facts:

1. That the merchandise involved herein consists of wool hooked rugs exported from Tientsin, China, on or about March 20, 1940, and May 15, 1940.

2. That at the time of exportation such or similar rugs were not freely offered for sale or sold for home consumption in China.

3. That the merchandise was appraised in United States dollars at the prices set forth in the respective consular invoices in the cases at bar, less nondutiable charges.

4. That at the time of exportation, because of the export controls and currency regulations imposed by the Japanese occupying authorities, such or similar merchandise was offered for sale and sold in Tientsin, China, for exportation to the United States only at a price which included a rate of exchange of currency acquired by linking the transaction with another transaction between a Chinese importer and an American exporter.

5. That there was not included in such price any item imposed by the Japanese occupying authorities or any governmental agency by way of an export tax or other exaction or excess.

6. That at the time of exportation such or similar rugs were freely offered and sold to all purchasers in the principal market, Tientsin, China, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States, at the prices in United States dollars set forth in the respective consular invoices in the cases at bar.

I conclude as matters of law:

1. That there was no foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, for the merchandise involved herein.

2. That the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise here involved.

3. That such value is the appraised value for each of the items involved herein.

Judgment will be rendered accordingly.