(A.R.D. 171)

CONTINENTAL FORWARDING, INC. *v.* UNITED STATES

Entry No. 711268.

Second Division, Appellate Term

(Decided March 31, 1964)

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Joseph F. Donohue* of counsel) ; *Barnes, Richardson & Colburn* (*Hadley S. King* of counsel) ; *Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) ; *John D. Rode* (*Ellsworth F. Qualey* of counsel) ; *Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) ; and *Julius Rosen* for the appellant.

*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: In this cause of action, appellant has invoked the jurisdiction of the court, pursuant to the provisions of section 2636, title 28, United States Code, by filing an application for review of the decision and judgment of the trial court, *Continental Forwarding, Inc.* v. *United States*, 46 Cust. Ct. 579, Reap. Dec. 9910.

This controversy is familiarly referred to as the "MITI" case. That name derives from the initials of an agency of the Imperial Japanese Government, known as the Ministry of International Trade and Industry, which will be described in greater detail, *infra*.

The subject merchandise consists of binoculars, imported from Japan, described and appraised as follows:

| Description | Invoice value | Appraised value | Claimed value |
| --- | --- | --- | --- |
| 6 x 30 ZCF binoculars, with case____ | $7.20 | $8.35 | $7.10 |
| 8 x 30 ZCF binoculars, with case____ | 8.10 | 8.80 | 8.10 |
| 7 x 35 ZCF binoculars, with case____ | 8.15 | 9.50 | 8.10 |

It was stipulated and agreed between adversary counsel that:

The Tokyo-Yokohama area was the principal market in Japan for the sale of binoculars, such as or similar to plaintiff's exhibit 1.

Export value was the proper basis for appraisal, and the values claimed by appellant are based on export value.

The price of such binoculars did not vary by reason of the quantities purchased.

Sales of binoculars, such as or similar to plaintiff's exhibit 1, were made to any one who wished to purchase for exportation to the United States, without any restrictions as to use, disposition, resale price, territory of resale, or in any other respect.

The Japanese laws, rules, and regulations applicable to the exportation to the United States of certain products, including binoculars,

such as or similar to plaintiff's exhibit 1, and English translations therof, were received in evidence.

It was further stipulated that any amendments or supplements to any of the foregoing laws, rules, or regulations may be introduced by consent of the parties, together with true translations thereof.

In the course of its opinion, the court below, after quoting the provision for export value and the facts that were stipulated, stated—

The effect of the foregoing stipulated facts leaves for determination herein, in finding dutiable export value, the price of binoculars, such as or similar to the items in question, "in the ordinary course of trade," which statutory phrase is defined in the Customs Simplification Act of 1956, *supra*, section 402(f)(2), as follows:

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

It was the opinion of the court that, inasmuch as the evidence produced at the hearing was insufficient to overcome the presumption of correctness attaching to the decision of the appraiser, the statutory export value for the binoculars in issue, as represented by the appraised value, constituted the proper basis of appraisement.

Statutory export value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (70 Stat. 943) (19 U.S.C. § 1401a(b)), as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

It is stated in the opinion below that—

The appraised values are prices for these bonoculars [*sic*] set up by the Ministry of International Trade and Industry, hereinafter referred to as "MITI," an agency of the Japanese Government, established under authority derived from a cabinet order, issued pursuant to the Foreign Exchange and Foreign Trade Control Law. * * *

In chapter I, article I, the purpose of the law is stated to be as follows:

The purpose of this Law is to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper development of foreign trade and for the safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

Chapter VI of said law, relating to "Foreign Trade," contains the following provisions—

(Principle of export)

Article 47. Export of goods from Japan will be permitted with the minimum restrictions thereon consistent with the purpose of this Law.

(Approval of export)

Article 48. Any person desiring to export goods from Japan may be required to obtain the approval of the Minister of International Trade and Industry for those types or areas of destination of export goods and/or method of transactions or payments as provided for by Cabinet Order.

2. The restrictions provided for by Cabinet Order specified in the preceding paragraph shall be within the limit of necessity for the maintenance of the balance of international payment and sound development of international trade or national economy.

(Certification of payment method)

Article 49. The Minister of International Trade and Industry may by ordinance require from any person desiring to export goods an adequate certification that satisfactory payment is provided as provided for by Cabinet Order.

The salient features of the record have been set forth in fine detail and in great length in the opinion of the court below.

It appears that the exportation from Japan of certain items of merchandise, including the binoculars in question, is controlled by rules and regulations promulgated pursuant to law by the Imperial Japanese Government (exhibit 4).

In order, therefore, that the subject binoculars might be exported from Japan, it was necessary for the exporter to obtain, first, the approval of the Minister of International Trade and Industry and, secondly, to provide, if required, an adequate certification that satisfactory payment is provided.

As typical of the routine procedure followed by the trade in the exportation of binoculars, such as those in controversy, we quote the summary of the testimony of the witness Herbert Ochshorn, as it appears in the opinion below—

The executive vice president of the Peerless Camera Stores, Inc., stated that, at the time of exportation of the present merchandise, his duties included the importation from Japan of binoculars of the sizes involved herein. His testimony is an explanation of the procedure followed in Japan for the exportation of merchandise, such as or similar to the binoculars in question, over a period of years when the witness was engaged in such transactions. An "Agreement," dated July 9, 1958 (plaintiff's exhibit 2), is a contract executed by the witness, representing Peerless Camera Stores, Inc., and the Fuji Trading Co., Inc., the supplier, showing that Peerless Camera Stores, Inc., agreed to purchase several items of binoculars of various sizes, including those under consideration. Two sets of prices are set forth therein. The lower prices appear under the heading, "Net Price," and are hereinafter referred to as "contract prices." The higher amounts are listed under the designation, "Check Price," which are the "MITI" prices for the different items. The difference between the contract price and the "MITI" price was paid in Japanese yen to the witness' agent in Japan, who

then issued to the Japanese supplier an "approval certificate," which is in the nature of a confirmation of the purchase of the merchandise. The amount of Japanese yen received by the American importer or his agent is available for use in Japan for any purpose, except the purchase of "MITI" merchandise. The witness stated that he used funds so acquired for development work and living and traveling expenses in Japan. Following negotiations that resulted in the execution of the agreement, exhibit 2, *supra*, Peerless Camera Stores, Inc., the American importer, opened a letter of credit in American dollars equal to the total amount of the "MITI" prices for the merchandise. Such a letter of credit was required under the rules and regulations of the Ministry of International Trade and Industry in order to obtain an export permit, allowing for the shipment of the merchandise from Japan. Before the Japanese supplier of the merchandise can draw on the letter of credit, there must be submitted to the bank in Japan the approval certificate issued by the purchaser, an on-board bill of lading, and the export permit.

The procedure above outlined is corroborated, except as to minor details, by appellant's other three witnesses, Kenneth P. Fisher, president of Scope Instrument Corp., Lionel Zimmerman, buyer for the Lafayette Radio-Electronics Corp., and Arnold Sulzbach, vice president of the Compass Instrument & Optical Co., Inc., each of whom had broad experience and close contact with the Japanese trade in binoculars as well as other Japanese merchandise.

It is contended by the appellee that the procedure above described is evasive and violates the laws of the Imperial Government of Japan. We find no evidence in the record to substantiate this claim. This practice has been followed by the witnesses for a number of years not only with respect to binoculars but also with regard to silk wearing apparel. *Baar & Beards, Inc.* v. *United States*, 37 Cust. Ct. 552, Reap. Dec. 8696, affirmed in *United States* v. *Baar & Beards, Inc.*, 40 Cust. Ct. 874, A.R.D. 85 (one judge dissenting), reversed in *United States* v. *Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705.

It appears from the opinion, in that case, that the control system described herein was followed at the time of exportation of the merchandise there involved between April and June 1953.

It would seem that if this course of action was in violation of Japanese laws, it would have been the subject of correction by Japanese authorities at the administrative or judicial level.

Although the *Baar* case was reversed by our appellate court (46 CCPA 92, C.A.D. 705), it did not pass upon the application or scope of the regulations, above referred to, but was of the opinion that—

* * * no substantial evidence showing error in the appraiser's valuation was presented by the importer, * * *.

Near the end of its opinion herein, the lower court makes this statement—

The values found by the appraiser for the items under consideration are *minimum export prices* established by the Ministry of International Trade and

Industry of Japan, a duly organized governmental agency established pursuant to law. * * * [Italics ours.]

We are constrained to disagree with this statement.

As pointed out earlier in this opinion, MITI, in the exercise of its control authority at the time of this exportation, operated an ingenious system by which it controlled the exportation of certain items of merchandise, but in no proper sense were minimum export prices "established" by MITI.

Appellee's contention that the Imperial Government establishes, in substance, the statutory value for the subject merchandise at the so-called "MITI" prices, loses sight of the fact that market value, in a tariff sense, is the price fixed by merchants and dealers in given commodities rather than, as in this case, the artificial price fixed by the Ministry.

The practice and conditions surrounding the purchase, payment, and exportation of merchandise of the class or kind under consideration involve primarily a financial manipulation of funds available to pay for the merchandise, with provision made for the use in Japan by the importer of the balance between the "contract" or market price and the "MITI" price.

As well stated by counsel for appellant in oral argument, "MITI" does not fix the market value of merchandise, it regulates conditions pertaining to the exportation of the merchandise.

The instant shipments were purchased and exported in conformity with the avowed underlying principles set forth in the Foreign Exchange and Foreign Trade Control Law, *supra*, that is—

* * * to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper development of foreign trade and for the safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

As previously stated, MITI established a control system pursuant to Japanese laws to govern the exportation of merchandise from Japan, which was properly observed in this case. The net result is that the system not only favored the importer in securing its merchandise at less than MITI prices, but also contributed to the economy and financial structure of the Imperial Government by requiring the importer to use in Japan the money remitted to the company at the time of exportation. The entire transaction was in harmony with the letter and spirit of the Japanese control law.

The appraiser adopted the so-called minimum prices established by MITI as the statutory export value of the subject merchandise. We are of the opinion that the appraisement was erroneous. The evidence does not support a finding that the MITI minimum prices fairly rep-

resented the export value of the imported merchandise within the purview of section 402(b) of the Tariff Act of 1930, as amended, *supra*, nor that the MITI prices ever inured to the exporter.

The consistent and continued method of doing business shown by the record leaves little room for doubt that the trade practice and procedure for a reasonable time, at and prior to the exportation of the merchandise undergoing appraisement, were "normal" in the trade under consideration.

The court below summed up Ochshorn's testimony in a most favorable light, as follows:

The witness testified that the method of payment and the procedure followed in obtaining the merchandise covered by the agreement, exhibit 2, *supra*, are representative of the practice followed by him over a period of 5 years, that throughout the period market prices were stable, and that offers of sale for binoculars, like those in question, were received from a number of other firms, which included the Oriental Trading Co., Orient Trading, Central Housewares, and Eiko Kokei, all of whom are located in Tokyo.

Ochshorn, Fisher, Zimmerman, and Sulzbach, each of whom was well informed and experienced in the Japanese market, had made substantial purchases of binoculars, such as or similar to those in controversy, and were familiar with their prices. Each of these witnesses had received offers and had purchased binoculars in Japan during the first part of 1958. However, as stated in the brief of appellee and as reflected in the record before us, the evidence shows offers or purchases of binoculars of the three sizes in controversy, as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| 6 x 30 ZCF | $7. 10, | $7. 01, | $7. 30, | $7. 00 | | |
| 8 x 30 ZCF | $8. 10, | $8. 02, | $8. 20, | $8. 00 | | |
| 7 x 35 ZCF | $8. 10, | $8. 80, | $8. 23, | $8. 12, | $8. 20, | $8. 00 |

It is our opinion that appellant has failed to establish a uniform single price at which the subject merchandise is sold for export. *M. V. Jenkins et al.* v. *United States*, 34 CCPA 33, C.A.O. 341, and cases therein cited.

It is also clear that the so-called MITI or check price is an artificial figure which serves primarily and essentially as a control feature, rather than as a representative export value, there being no evidence of sales at the MITI or check prices.

We are further of the opinion that export value has not been shown to exist, notwithstanding the fact that counsel have stipulated to the contrary. We are not bound by such an agreement to the extent that it invades a legal conclusion.

Upon the record before us, we find as matters of fact:

1. That the merchandise in question consists of three items of binoculars, sizes 6 by 30 ZCF, 8 by 30 ZCF, and 7 by 35 ZCF, exported from Japan and entered at the port of New York.

2. That the Tokyo-Yokohama area was the principal market in Japan for the sale of binoculars, such as or similar to plaintiff's exhibit 1.

3. That the Japanese laws, rules, and regulations under the Ministry of International Trade and Industry (MITI) of the Imperial Japanese Government do not fix the market value of merchandise for appraisement purposes, but regulate the exportation of merchandise from Japan for that country's economic and financial development.

4. That there is no evidence of sales of such or similar merchandise at the MITI or check prices.

5. That there has been a failure on the part of appellant to establish a uniform single price at which such or similar merchandise is sold for exportation to the United States.

We, therefore, conclude as matters of law:

1. That the appraisement of the subject merchandise at the MITI prices was erroneous.

2. That the evidence fails to establish the existence of a statutory export value for the merchandise.

In the interest of justice, the case is remanded to the lower court in order that the parties may have an opportunity to prove a statutory value for the merchandise.

Judgment will be entered accordingly.