**CONTINENTAL FWDG. COM-
PANY et al.**

v.

**UNITED STATES.**

R.D. 11659; Reappraisement R60/2082
and four others.

United States Customs Court.

April 10, 1969.

Sharretts, Paley, Carter & Blauvelt, New York City (Joseph F. Donohue, New York City, of counsel), for plaintiffs.

William D. Ruckelshaus, Asst. Atty. Gen. (Glenn E. Harris, New York City, trial attorney), for defendant.

WATSON, Judge:

These consolidated appeals concern the correctness of appraisement of certain binoculars exported from Japan at so-called "MITI" prices. "MITI" indicates Ministry of International Trade and Industry, an administrative agency of the Japanese government which controlled exports through licenses, issued on proof of payment in an approved amount of foreign currency.

The question has been the subject of prior litigation. United States v. Continental Forwarding, Inc., 53 CCPA 105, C.A.D. 885 (1966), affirming Continental Forwarding, Inc. v. United States, 52 Cust.Ct. 629, A.R.D. 171 (1964), which reversed Continental Forwarding, Inc. v. United States, 46 Cust.Ct. 579, Reap. Dec. 9910 (1961).

A stipulation was entered into between counsel for the respective parties, the pertinent parts of which on the issue here involved, are as follows:

2. The record in United States v. Continental Forwarding, Inc., Customs

Appeal 5175, C.A.D. 885, may be incorporated in and made a part of the record herein.

3. The merchandise here consists of prism binoculars, similar in all respects herein material to the prism binoculars which were the subject of said Customs Appeal 5175.

4. Said merchandise was appraised at the so-called MITI check prices prevailing on the respective dates of exportation, as was the merchandise in Customs Appeal 5175, on the basis of export value, as defined in 19 U.S.C. Sec. 1401a(b), and said statutory basis of appraisement is not challenged by either party.

5. At all times relevant to these cases, prism binoculars were subject, on exportation, to MITI regulations; the procedure followed for purchasing and paying for the merchandise at bar was the same as that described in Customs Appeal 5175; and the procedures required to be followed in obtaining export licenses and permits for merchandise subject to MITI regulations were the same throughout the period involved in Customs Appeal No. 5175 and in these appeals.

6. If the Court finds that the appraised values are not correct then it is agreed that the prices stated on the commercial invoices, plus 3%, represent all the elements of statutory export value, under 19 U.S.C. Sec. 1401a(b), and that said invoices may be received in evidence without being marked.

The procedure followed by the trade in the exportation of binoculars from Japan was summarized by our appellate court as follows in United States v. Continental Forwarding, Inc., *supra*, 53 CCPA at 108:

\* \* \* A person seeking to import binoculars into the United States would select a Japanese supplier. A contract would be entered into wherein the importer would agree to purchase the binoculars described in the contract. Two prices would be set forth in the agreement, the higher price being the MITI price and the lower price being the "contract price." The difference between the MITI price and the contract price would be paid to the importer in Japanese yen which was available for use in Japan only, for any purpose except the purchase of goods on the MITI list. After the contract was executed, the importer opened a line of credit in American dollars equal to the amount of the MITI prices for the goods and the Japanese yen would be deposited to the account of the importer.

The issue presented in this case is the correctness of an appraisement at the MITI prices where (1) no sales were made at such prices, (2) the merchandise was purchased at lower "contract" prices, (3) payment was effected by the tender of a letter of credit in the amount of the MITI prices—such tender being necessary to obtain an export permit, and (4) the difference between the MITI and contract prices was credited to the account of the purchaser-importer. More specifically, the question is whether the export value of the involved binoculars under section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 [1] is represented by the "contract" or so-

---

1. Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 19 U.S.C. § 1401a (b):

EXPORT VALUE.—For the purposes of this section, the export value of the imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

called purchase prices plus 3 percent, as plaintiffs contend, or by the appraised values which reflect the "MITI" "check list" prices for the merchandise as established and administered by the Japanese Ministry of International Trade and Industry (MITI).

In support of the appraised values, the defendant points out that the difference between the MITI and contract prices represents rebates given to the plaintiff-importer in Japanese currency. Such rebates, defendant argues, constitute such a violation of Japanese criminal laws as to remove these transactions from "the ordinary course of trade" and to preclude the net rebated prices from being regarded as the "prices" at which the merchandise was freely sold or offered for sale for purposes of section 402(b), *supra*.

The defendant in seeking to prove that the purchasing procedures heretofore described violated Japanese Export Control Laws and currency regulations, offered two exhibits, F and G, which were received in evidence. One witness testified for the defendant and plaintiffs called one witness in rebuttal.

Defendant's exhibit F is a report from the office of the United States regional customs representative in Japan dated March 2, 1967. The report sets forth the written responses of MITI and the Japanese Ministry of Justice to a series of inquiries propounded by the United States Department of Justice which were submitted to the above-named Ministries on December 8, 1966.

The aforementioned written responses to the inquiries, disclose that in issuing export licenses MITI relied *inter alia* upon the prices mentioned in the application for same, and that the customhouse, in approving exports, checked the MITI export license against "the invoice, certificate of method of payment and others" to determine whether they were the same (defendant's exhibit F, answers No. 4, 5); that "the fact that price control was in force was made public, but the prices themselves were not published. * * * [check] prices themselves were known, for in many cases, most of [the] exporters had entered into export transaction agreements"; that, further "even parties not participating in such agreements also eventually learned of such prices through their own experience in filing applications for approval" (defendant's exhibit F, answer No. 10).

It also appears from the "MITI" responses in defendant's exhibit F that although several "suspicious cases turned up", no sanctions were imposed due to insufficient evidence (defendant's exhibit F, answer No. 19), it being extremely difficult to link the payment of rebates or refunds to the export of the goods concerned (defendant's exhibit F, answer No. 20). "MITI" considered that a rebate by the Japanese exporter to the American importer or to his agent in Japan violated the provisions of its Foreign Exchange and Foreign Trade Control Law (answers No. 25 and No. 26). Defendant's exhibit F further indicates that during 1957 some 31 charged violations arose from rebates or refunds of Japanese currency in connection with check prices administered by MITI. The final disposition of the indictments were not indicated in the records of the Ministry of Justice, but that Ministry referred to five published decisions of the Japanese courts representing prosecutions for making rebates or refunds on MITI check price merchandise (defendant's exhibit F).

Defendant's exhibit G is an affidavit executed on March 22, 1967 by Arthur K. Mori, a United States citizen, and a member in good standing of the bars of the State of Connecticut and of Japan. The affiant recites that he is familiar with Japanese laws and regulations and procedures involved in the exportation of merchandise from Japan to the United States. In connection with the export of binoculars in 1958, Mr. Mori stated that in addition to the requirement of an export "permit" an "export

license" was required by virtue of the Japanese Foreign Exchange Law. In essence, Mr. Mori gave it as his opinion that a refund or rebate to the United States importer in Japanese or any other currency of the difference between the check price and the sales price under the circumstances indicated in the present case would have constituted a clear-cut violation of Japanese law.

Defendant called as its witness, Mr. Timothy S. Williams, an attorney at law and partner in the law firm of James B. Anderson, New York City. He stated that while he was not a member of the Japanese bar, he had formally studied Japanese law at the University of Kyoto from September 1958 until March 1960 (R. 20). He had also been previously employed by the same law firm of which Mr. Mori is a partner and in such association had done research and prepared legal opinions "on points of Japanese commercial tax and foreign exchange law", approximately 50 percent of his work involving some aspect of foreign control and regulation (R. 22–23). He also had conducted a course in Japanese law at Columbia University Law School, and is currently serving as editor of a periodical entitled "Law in Japan", published by the Japan-American Society for legal studies (R. 23–24). Mr. Williams testified that he concurred in the opinion expressed by Mr. Mori (paragraph 6 of defendant's exhibit G) to the effect that under circumstances such as those involved in the present case, such transaction "would have constituted a clear-cut violation of Japanese law."

Mr. Williams commented upon an opinion of a Japanese court in State v. Gosho, wherein the court, after observing that the alleged violations of law had arisen from the "check price system," had stated, *inter alia*:

As argued by the defense counsel, it is difficult to have a foreign country change its import restriction policy and that cannot be expected of Japanese trading companies. However, for such purpose, recourse such as appropriate negotiations through the Japanese Government was not closed, and Japanese trading companies could have collectively pressed MITI and other governmental agencies concerned as one of the methods to promote such action. Nevertheless, no such action seems to have been taken. Furthermore, even if such transactions at low prices were unavoidable, one cannot say that no lawful [alternatives] existed to earmark and dispose of the differentials accruing from such transactions. The surreptitious act of receiving payments in yen in Japan cannot be tolerated from the standpoint of the government enforcing control over foreign exchange, and we refuse to believe that, in normal situations, it is impossible to expect Japanese trading companies to refrain from settling said differentials in such manner. [Exhibit III, part of defendant's exhibit G, pp. 17–18.]

In the above connection, Mr. Williams testified that the court was "supposing," in his opinion, that "there would have been some other lawful means * * * for the defendant's in this case to dispose of the yen they had accrued" (R. 36). He stated that the existence of MITI violations, specifically involving a refund or rebate, was common knowledge in Japan "among lawyers, business men, and so forth" (R. 40).

The witness testified that, assuming transactions such as those herein involved, where the sales price was below the MITI price, the merchandise was delivered for export, tender of funds was made at the MITI price, and thereafter the seller refused to pay the purchaser the difference between the MITI value and the true purchase or contract price, a Japanese court would enter judgment in favor of the purchaser who sued for the amount of such difference. He stated that the *collection* of the judgment would require a license from the Foreign Exchange Authority (R. 42–43).

Mr. Williams further testified that the courts have held that "acts which vi-

olate merely regulatory legislation are not, because of the criminal acts, void in themselves as civil transactions" (R. 45) and that "the Foreign Exchange and Foreign Trade Control Law violations which have so far come before the Courts have been, in most instances, found to be in the regulatory category" (R. 46). In essence, he stated that the contracts for the sale of the merchandise and for refund of the overpayment would be valid, but the refund would be appropriate only if a license were issued (R. 45–46).

Plaintiff called in rebuttal Mr. George Yamaoka, a member of the New York bar since 1931. He stated that he had been primarily engaged since that date in transactions connected with Japanese-United States trade, and had followed the regulations and laws involving the two countries since that time. The witness testified that during the course of his practice he had had occasion to "advise clients on import purchases from Japan involving the so-called MITI merchandise", and that he was "generically" familiar with the Japanese laws affecting those transactions (R. 63). Mr. Yamaoka stated that he had heard the testimony of Mr. Williams concerning the use of "rebate money" in Japan as outlined by the court in Continental Forwarding, Inc. v. United States, *supra,* 52 Cust.Ct. 629, A.R.D. 171 (1964) and that he likewise was of the opinion that an application to "MITI" for an export license, using an invoice at MITI prices, constituted an illegality under the laws of Japan, as would the payment of the rebate itself (R. 64–65). With respect to the ordinary course of trade in MITI transactions such as those outlined by the court in Continental Forwarding, Inc., *supra,* 52 Cust.Ct. at page 632, specifically whether the type of agreement there set forth was frequently followed, plaintiffs' witness testified:

A. I would say this is not an unusual, but a very formal transaction, and frequently undertaken [R. 65].

Plaintiffs' witness further testified that assuming that in the case of a civil suit to enforce a rebate agreement, a Japanese court should enter a judgment for the plaintiff, collection of which was, however, made subject to the issuance of a license which was later issued, then in such circumstances the payment of the rebate pursuant to the judgment and license would not be illegal (R. 68–69). Mr. Yamaoka stated that he agreed with the testimony of defendant's witness, Mr. Williams, to the effect that a contract for the sale of merchandise and for a refund in the case of "MITI" transactions would be valid, but that the rebate would be appropriate only if a license was issued. In this connection, the witness stated that "there is an area of discretion to the ministering officials as to whether or not in a specific instance they should grant a license or not" (R. 71). Mr. Yamaoka agreed with Mr. Mori's statement (defendant's exhibit G, page 8) that after the institution of the check price system, "a large number" of businessmen engaged in transactions complying with the law only in form and in fact violated the law—that "that general practice exists, to a great extent, and that it is a matter of common knowledge not only among the public in Japan but among the ministerial staff (R. 73).

The appellate term, second division of this court in its opinion in A.R.D. 171, *supra,* rejected the position of the Government that the values found by the appraiser were "minimum export prices" established by "MITI" and were therefore the appropriate basis for export value. In so doing, the court, 52 Cust. Ct. 629, at page 634, stated:

We are constrained to disagree with this statement.

As pointed out earlier in this opinion, MITI, in the exercise of its control authority at the time of this exportation, operated an ingenious system by which it controlled the exportation of certain items of merchan-

dise, but in no proper sense were minimum export prices "established" by MITI.

Appellee's contention that the Imperial Government establishes, in substance, the statutory value for the subject merchandise at the so-called "MITI" prices, loses sight of the fact that market value, in a tariff sense, is the price fixed by merchants and dealers in given commodities rather than, as in this case, the artificial price fixed by the Ministry.

The practice and conditions surrounding the purchase, payment, and exportation of merchandise of the class or kind under consideration involve primarily a financial manipulation of funds available to pay for the merchandise, with provision made for the use in Japan by the importer of the balance between the "contract" or market price and the "MITI" price.

\* \* \* "MITI" does not fix the market value of merchandise, it regulates conditions pertaining to the exportation of the merchandise.

In commenting on the evidence in relation to the appraised values taken therein, our appellate term (A.R.D. 171), further stated as follows (52 Cust.Ct. at page 634–635):

> The appraiser adopted the so-called minimum prices established by MITI as the statutory export value of the subject merchandise. We are of the opinion that the appraisement was erroneous. The evidence does not support a finding that the MITI minimum prices fairly represented the export value of the imported merchandise within the purview of section 401(b) of the Tariff Act of 1930, as amended, *supra*, nor that the MITI prices ever inured to the exporter.

The consistent and continued method of doing business shown by the record leaves little room for doubt that the trade practice and procedure for a reasonable time, at and prior to the exportation of the merchandise undergoing appraisement, were "normal" in the trade under consideration.

Our appellate court in its decision (C.A. D. 885), *supra*, affirming the appellate term, commented, 53 CCPA at page 115, as follows:

> We agree with the comments and conclusions above and, as they are supported by substantial evidence, we affirm the appellate term's determination in this respect.

█ As noted, the appellate court upheld the finding of the appellate term of this court that the "MITI" prices therein question were not a proper basis for the determination of export value because no sales were made at such prices. On that point the record here is identical with that in Continental Forwarding, Inc., *supra*, 53 CCPA 105. Accordingly, for the reasons given by the appellate court, appraisement of the involved merchandise at the so-called "MITI" check prices is erroneous.

Defendant's argument in the present case appears to be that the purchase procedure herein was unlawful under the laws of Japan and that appraisement of the merchandise at prices lower than the "MITI" prices was improper. In my opinion, the evidence directed to the purported violations of the laws of Japan, even if true, is irrelevant and immaterial in the determination of the proper value of the involved merchandise. The evidence here establishes that Japanese export control laws required the true transaction to be reflected in the papers tendered with the application for an export license. Specifically, the Government's position is that the violation would be in the failure to indicate that a rebate was due from the amount stated on the invoice and that the transfer of such rebate to or for the account of a nonresident, *if done without a license*, would violate a Japanese currency control law. However, the testimony of defendant's witness in this case indicates that the contract of sale it-

self was lawful, even to a claim on the part of the purchaser for a rebate. Accordingly, not only did the purchaser of the merchandise in this case obtain good title to the goods but it could obtain judgment in its favor for a rebate which was not paid in accordance with the contract. The *enforcement* of the judgment itself would require a license (R. 45–46, 47). The record indicates that "legal alternatives" existed for the collection of such rebates.

The witness for the plaintiffs also agreed that contracts of the type involved in such circumstances as those at bar involving a rebate, while subject to prosecution or while involving the possibility of a prosecution were in themselves, legal (R. 70). What illegalities are alleged occurred *subsequent* to the sales transaction and did not vitiate, in my opinion, the price at which the merchandise was freely sold. (Section 402(b), Tariff Act of 1930, as amended.) Violations or irregularities which may occur after the sale or agreement to sell cannot affect the market value or price of the merchandise under consideration. While the additional evidence adduced in this case may fairly be said to establish that the procedures employed subsequent to the purchase of the subject merchandise involved violations of certain export laws and fiscal regulations of Japan, that fact did not change the contract price as one entered into freely between the purchaser and seller. Even sales in violation of the rules or regulations of a semiofficial Government agency may nevertheless form a valid basis of appraisement. (See, United States v. Biddle Purchasing Co. et al., 21 Cust.Ct. 297, Reap.Dec. 7616 (1948).)

In the *Biddle* case, *supra*, the freely offered price contained a discount from the published minimum price. The converse of this question has been previously before this court in a case where the freely offered price included something in addition to the cost of the merchandise plus the profit. See, Atlas Trading Co. v. United States, 31 Cust.Ct. 381,

Reap.Dec. 8243, affirmed 34 Cust. Ct. 546 (1955), A.R.D. 57. There, the prices at which such or similar merchandise was freely offered included a rate of exchange acquired by so-called "linking", a practice followed of linking one export transaction with another transaction between a Chinese importer and an American exporter. The trial court in the *Atlas* case, page 381, stated:

* * * There is no evidence that the merchandise was ever offered or sold for export at a price which did not include a link rate * * *.

In my opinion, the evidence indicates that the so-called "check price" was not an inseparable part of the sales transactions here involved and, accordingly, does not form a basis for dutiable value.

In Baar & Beards, Inc. v. United States, 37 Cust.Ct. 552, Reap.Dec. 8696 (1956), the court held that certain silk scarves, controlled by "MITI" regulations were not dutiable on the basis of the export prices fixed by "MITI", as appraised, but were properly subject to appraisement at the prices at which the merchandise was actually sold. The evidence therein showed that payment for the goods was made at the "MITI" price and that the difference between such price and the lower contract price was subsequently refunded to the purchaser. That decision was sustained by the appellate term of this court (United States v. Baar and Beards, Inc., 40 Cust.Ct. 874, A.R.D. 85 (1958)). While the latter decision was reversed by our appellate court on appeal (United States v. Baar & Beards, Inc., 46 CCPA 92, C.A. D. 705 (1959)) it appears that our appellate court did so because it found that substantial evidence was lacking to establish that the merchandise was *freely offered* for sale at the so-called contract prices. The fundamental question in the case before the lower court in 40 Cust. Ct. 874, *supra*, as to whether the "MITI" price or the lower contract price was the proper basis of appraisement, was not passed upon by the appellate

court in C.A.D. 705, *supra*, the court concluding, at page 97 as follows:

> In view of the above conclusions, it is unnecessary to consider whether export value may properly be predicated on transactions which might be contrary to the law of the country of export.

■ Of prime consideration in the determination of the proper dutiable value of the involved merchandise is the contention of the defendant that the transactions in issue were not in the "ordinary course of trade". This statutory phrase is defined in the Customs Simplification Act of 1956, section 402(f) (2), as follows:

> The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

In the above connection, defendant's witness Mr. Mori, as heretofore noted (defendant's exhibit G, page 8) testified to the effect that it was "common knowledge" that large groups of Japanese sellers and purchasers of merchandise, after the institution of the check price system, engaged in transactions which met the requirements of the "MITI" regulations in form only but in fact violated the spirit of the law and certain of its provisions. The statutory definition of "ordinary course of trade" says nothing about legality or illegality. In my opinion, the record in this case supports the conclusion, as likewise held in (52 Cust. Ct. 629) *supra*, that—

> The consistent and continued method of doing business shown by the record leaves little room for doubt that the trade practice and procedure for a reasonable time, at and prior to the exportation of the merchandise

undergoing appraisement, were "normal" in the trade under consideration.

It has been stipulated that if the court finds the appraised values are not correct then export value, the proper basis of appraisement, is represented by the invoice prices plus 3 percent.

On the basis of the record in this case, including that in the incorporated case, I find as facts:

1. That the merchandise in question consists of three items of binoculars, sizes 6 X 30 ZCF, 8 X 30 ZCF, and 7 X 35 ZCF, exported from Japan and entered at the port of New York.

2. That the Japanese laws, rules, and regulations under the Ministry of International Trade and Industry regulated the exportation of merchandise from Japan for that country's economic and financial development, but did not fix the market value of the merchandise for appraisement purposes.

3. That there is no evidence of sales of such or similar merchandise at the "MITI" or check price.

4. That while there may have been some violations of the laws of Japan in the sale of the involved merchandise, the contract of sale itself as between the seller and purchaser was lawful, and was within the "ordinary course of trade" within the meaning of section 402(b) of the Tariff Act of 1930, as amended.

5. That, by agreement of the parties the prices stated on the commercial invoices, plus 3 percent represent all the elements of statutory export value.

I hold as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper basis for the determination of the value of the merchandise here involved.

2. That appraisement of the involved merchandise at the "MITI" prices was erroneous.

3. That the statutory export value of each item of merchandise herein involved is represented by the invoice price in each case plus 3 percent.

Judgment will issue accordingly.