(Reap. Dec. 10864)

SAM YEUNG CO. *v.* UNITED STATES

Entry Nos. 768745; 77272; 715785.

(Decided November 23, 1964)

*Lane, Young & Fox* (*William H. Fox* and *William Whynman* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the defendant.

DONLON, Judge: Plaintiff is before the court litigating the appraised value of canned water chestnuts, whole and sliced, and of canned bamboo shoots.

These three appeals to reappraisement have been consolidated for purposes of trial. The official papers are in evidence. Both parties introduced proofs.

An earlier litigation (*idem* v. *idem*, 52 Cust. Ct. 572, Reap. Dec. 10760) involved an importation of water chestnuts from Hong Kong.

The proofs before the court now identify the country of origin of the instant merchandise variously as Formosa and as Taiwan. There is similar confusion as to the name of the country in both of the briefs. The court takes judicial notice that Taiwan is the Chinese name of an island which formerly, while under Japanese control, was known as Formosa. Taiwan and Formosa are different names, neither wholly accurate, of the territory over which the Republic of China now has jurisdiction. (This is by way of distinguishing it from the People's Republic of China, which controls mainland China.) For convenience, in this opinion, I shall refer to the country of origin of this merchandise as Taiwan.

Notwithstanding a contrary representation by plaintiff, the several dates of exportation and of entry, as to the three appeals and the three classes of merchandise before me, are shown by the official papers to be as follows:

| Appeal | Merchandise | Export | Entry |
|--------|-------------|--------|-------|
| R61/3542 | Bamboo Shoots | 7–30–59 | 9–8–59 |
| R61/23312 | Water Chestnuts (whole *and* sliced) | 5–31–61 | 7–18–61 |
| R62/835 | Water Chestnuts (whole) | 5–31–61 | 7–18–61 |

All entries were made at the port of New York.

It has been stipulated by the parties that none of this merchandise was included in the final list (T.D. 54521), published by the Secretary of the Treasury under the Customs Simplification Act of 1956. De-

fendant reports that appraisement was on the basis of export value. That is the basis of valuation for which plaintiff contends.

The issue is a difference of view as to what the amount of the export value is. Appraisement was at so-called "floor prices" that were said to have been set by the Foreign Exchange and Trade Control Commission of the Executive Yuan, in Taiwan, and which were in effect at the times of the several exportations litigated here. The merchandise was invoiced to plaintiff at prices that are lower than these "floor prices"; and it is plaintiff's claim that the lower actual invoice prices correctly reflect the export values, both of the bamboo shoots and of the whole and sliced water chestnuts.

The competing values per case are, in brief, as follows:

| Appeal | Merchandise | Appraised | Claimed |
|--------|-------------|-----------|---------|
| R61/3542 | Bamboo Shoots (6×5 lbs.) | $4. 00 | $3. 50 |
| R61/23312 | Whole Chestnuts (6×5 lbs.) | 6. 00 | 5. 00 |
|  | Sliced Chestnuts (6×5 lbs.) | 6. 00 | 5. 50 |
| R62/835 | Whole Chestnuts (24×20 oz.) | 6. 80 | 5. 80 |

Section 402(b) of the Tariff Act of 1930, as amended, is as follows:

For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Plaintiff has, of course, a twofold burden of proof; first, to overcome the presumption of correctness that attaches to the appraiser's action; and, second, to establish by sufficient proofs the export value which plaintiff claims as the correct value. Inasmuch as neither party contends that the cost of containers and other expenses were not included in price, the court accepts the controversy as one having to do solely with the amount of inclusive price, as defined in section 402(b), supra.

Plaintiff's proofs include the testimony of Mr. Chek Sam Jon, who said that he is the sole owner of the plaintiff, Sam Yeung Co., and four documentary exhibits that were introduced into evidence by plaintiff. Collective exhibits 1 and 2 concern the letters of credit that were issued to Cheng Chuan Trading Co., seller of the merchandise. Exhibit 3 is the affidavit of Mr. Fu Wang Chou, manager of Cheng Chuan Trading Co., in Taipei, Taiwan. (This affidavit lacks a venue. A seal is impressed which purports to be that of the Consular Service of the United States of America in Taipei, Taiwan; but, except for the inscription on the seal, there is nothing to show where the affidavit was

made.) Exhibit 4 is not cited by plaintiff in the arguments advanced in its brief. It is a letter written by Mr. Harold F. Smith, who signs himself as Regional Customs Representative, writing from Hong Kong on the letterhead of the United States Treasury Department, Bureau of Customs. The letter is dated March 11, 1964, and is addressed to the Commissioner of Customs, at Washington. (This letter was in the possession of defendant at the trial. When defendant failed to introduce it into evidence, plaintiff asked leave to do so, and leave was granted.)

Defendant's proofs consist of two collective exhibits, both of which are reports by customs representatives abroad, made to the Commissioner of Customs in Washington. Exhibit A is dated January 24, 1964. It is signed by Perry J. Spanos, customs representative in Tokyo, Japan, and is approved by Harold F. Smith, who signs as Regional Customs Representative. There are numerous attachments to exhibit A. Exhibit B is a report, dated March 11, 1964, at Hong Kong, signed by Regional Customs Representative Smith, which reports further to the exhibit A report. Although exhibit B refers to several attachments, there is actually attached only one sheet. This appears to be a photostatic reproduction of part of an uncertified paper captioned "Regulations for the Control of Foreign Exchange and Trade Promulgated by the Executive Yuan on April 11, 1958 Revised on November 20, 1958 and August 8, 1959." Those regulations are referred to in the exhibit B report. However, this sheet of paper lacks certification or other evidence of its authenticity as a translation into English of an identified Chinese document.

According to Mr. Chek's testimony, orders for all of the instant merchandise were placed by him personally, at prices that were offered by Cheng Chuan Trading Co. These are the prices shown on the invoices. They represent the sums that were remitted to Cheng Chuan Trading Co. by plaintiff through letters of credit (exhibits 1 and 2). Mr. Chek said that he had never heard of "floor prices." He bought chestnuts and bamboo shoots from many producers, but he could not recall the names of others than Cheng Chuan Trading Co., from whom he bought during the period from July 1959 to July 1961. There is evidence of other sales of such merchandise by Cheng Chuan Trading Co. during that period, besides the sales here in issue. Plaintiff adduced no evidence as to sales by other producers.

From the report of Customs Representative Spanos (exhibit A), it appears that the Foreign Exchange and Trade Control Commission of the Nationalist Chinese Government (Taiwan) had established minimum floor level export prices for canned vegetables, including bamboo shoots and water chestnuts. The Bank of Taiwan was the agency designated by the Commission to enforce these prices. Accord-

ing to Chao-mi Hao, director of the Export Department of the Commission, the bank "does not permit exportation of these commodities [i.e., canned water chestnuts and bamboo shoots] at values below these level prices."

How this procedure works out in actual practice is described quite frankly in two of the attachments to defendant's exhibit A.

The affidavit of Chan Sui-Tong, verified January 21, 1964, before the vice consul of the United States at Taipei, Taiwan, recites that Mr. Chan is president and manager of Chung I Trading Co., Ltd., of Taipei; that he has been in the business of exporting canned vegetables for over 20 years; and that he is "well familiar with local practices and procedures regarding manufacturing and selling of canned bamboo shoots and waterchestnuts in the United States," having in the past 13 years made regular large shipments to various American importers, some of whom Mr. Chan identified, including plaintiff.

Describing the floor prices procedure and actual practice under that procedure, Mr. Chan said:

* * * The Taiwan Government through its agency the Foreign Exchange and Trade Control Commission and the Bank of Taiwan controls the exportations of waterchestnuts, bamboo shoots, as well as other products, by imposing minimum "floor prices" below which prices exportations are not permitted. The procedure we exporters must follow is to, first, file an "export declaration" through the Bank of Taiwan showing the selling prices of which the merchandise is being sold. The bank checks these prices against the "floor prices" as issued by the FETCC and if they are the same or higher permission for export is granted. If the selling prices are lower permission for export is denied [sic]. From time to time, depending on the supply and demand of these canned vegetable products, our selling prices may be below the "floor level". In the past year we find this to be common mainly due to the keen competition. Therefore it is the practice of all local exporters to try to somehow by-pass these regulations. The most common method of doing this is to supply our own dollar exchange in order to come up to the "floor level". For example let us say that the "floor level" of our type of merchandise is $5.50 per case but the actual selling price is $5.00 per case. In that case we use the customer's Letter of Credit for the $5.00 and will buy from the bank from our own dollar account 50¢ worth of Taiwan currency. Another way of circumventing the "floor level" is to ask our client to open a letter of credit at the "floor level" price and then credit to him the difference between the actual selling price and the "level price" on an item which is not governed by these exchange regulations. In this case, a corrected invoice will be furnished to our buyers for customs report of actual prices.

Mr. F. W. Chow, general manager of Cheng Chuan Trading Co., in his statement attached to exhibit A, said (paragraphs 2 and 3) as follows:

2. According to the regulations of the Foreign Exchange and Trade Control Commission of the Executive Yuan, the export floor price for each case of canned bamboo shoots containing 6 cans of 5-lb. each is set at US $4.00 FOB, and that for each case of canned waterchestnuts containing 6 cans of 5-lb. each, US $5.50 FOB. Since these two kinds of commodities are agricultural products,

the production quantity depends on climate and weather. If the production quantity is high, cost of raw material naturally goes down. If production decreases on account of typhoon or drought, the market goes up. Therefore, when this Company buys goods from the manufacturers, we pay different prices on different occasions. We determine our selling price and make quotations to buyers in foreign countries after considering the cost price quoted by the manufacturers. As a result, in the past three or four years the selling price of most of our export sales of canned bamboo shoots and canned waterchestnuts exceeded the floor price prescribed by the FETCC; some were done in accord with those stipulated by the FETCC; and a small amount of sales was concluded below the FETCC floor price. However, when the selling price was lower than the FETCC floor price, we always made up the difference with self-provided foreign exchange. We could only do business in this manner. As a matter of fact, the Bank of Taiwan approved the settlement of foreign exchange and enabled us to conclude our export sales. Inasmuch as our American customers always give us an extremely low offer, are sometimes compelled to cut down our selling price to such an extent that it is lower than what has been prescribed by the FETCC if our cost price is low.

3. As far as I know, all exporters on Taiwan have been doing and will do the same when they sell canned bamboo shoots or canned waterchestnuts at prices lower than the FETCC export floor prices. They make up the difference by furnishing self-provided foreign exchange. By doing so, they can successfully conclude business transactions.

That there was adjustment on sales of the instant merchandise to plaintiff is corroborated by attachments to defendant's exhibit A, showing the foreign exchange settlements as to these sales. The reconciliation between unit price and floor price was effected variously, but it is clear that there was adjustment in one or more of the ways described in the excerpts from exhibit A, above quoted. That is to say, the separate status of sale price and of foreign exchange settlement is shown.

There might appear, at first blush, to be at least some resemblance between the Taiwan floor prices and the Japanese MITI controls which have been the subject of litigation that is not yet concluded. *United States* v. *Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705; *Continental Forwarding, Inc.* v. *United States*, 52 Cust. Ct. 629, A.R.D. 171, appeal pending. The headnote in the *Continental* case reflects the rule there laid down by the appellate division, as follows:

Certain binoculars, imported from Japan, were appraised at the so-called MITI or check prices accepted by the appraiser as representing statutory export value. This was an erroneous decision. The evidence establishes that there were no sales of such or similar merchandise for exportation at said MITI prices and, in fact, no export value was proven. The record discloses that the so-called MITI or check price is an artificial figure which serves primarily and essentially as a feature in the export control system created by the Japanese Ministry of International Trade and Industry rather than as a representative export value.

The proofs before us resemble in some respects and differ in others from the proofs in the *Continental* case. The Taiwan program of

floor prices is shown also to be a device for control of foreign exchange. Unlike the *Continental* case, however, the proofs here show that offerings and sales for export to the United States were freely made at competitive prices which, according to changing market conditions, might be more, the same as, or lower than the established floor prices. Sales of the instant exports were shown to have been freely made at prices lower than floor prices, and defendant's proofs confirm that this was so. Adjustment of foreign exchange proceeds was made by the seller, in conformity with Taiwan requirements, without contribution by plaintiff either in price or in the required extra foreign exchange.

The applicable law is the same. One standard for valuation is the price on sales (or offers) "to all purchasers." The appellate division found lacking, in the *Continental* case, "a uniform single price" on sales for export. But that is only one of possible proofs. It may be shown that in the ordinary course of trade sales were made to one or more purchasers, but not "to all purchasers," at a price which fairly reflects the market value. Here, conditions which affected the market have been shown with some particularity. The fact that all sales during the period have not been proven is not necessarily conclusive, as defendant seems to contend.

Mr. Chek's uncontradicted testimony as to prices and market conditions is corroborated by various of the documentary exhibits.

Defendant rests its case chiefly on the argument that plaintiff has not borne its burden of proof. At the outset, I stated what the two-fold burden is. Whether proofs suffice is to be determined from the entire record, including the proofs adduced by defendant. *Golding Bros. Co., Inc.* v. *United States*, 21 CCPA 395, T.D. 46926.

The proofs here effectively overcome the presumption of correctness that attaches to the appraisement. It is clear that both sales and offers to sell were made without conformity to floor prices.

As to proofs that sales were made freely at the prices which plaintiff claims, defendant cites *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495, and argues that, in the record before me, the evidence consists of conclusory statements and not of substantive proofs. There can be no quarrel with the legal principle for which the case is cited. It is sound law.

However, there are circumstances which distinguish the record here from the record that was judicially criticized in the *Brooks* case. The law that is applicable here is different. No longer does Congress require, in the cases before me, that there be proofs of sales (or offers to sell) to all purchasers. Here, it suffices if there be evidence of sales, freely made and fairly reflecting market conditions, at the prices for which plaintiff argues. There is such evidence, both in plaintiff's proofs and in those adduced by defendant.

I find as facts:

1.   That the merchandise of these appeals consists of canned water chestnuts, whole and sliced, and canned bamboo shoots, exported from Taiwan on July 30, 1959 (R61/3542), and May 31, 1961 (R61/23312, R62/835), respectively packed as recited in findings 4 and 5, below.

2.   That canned water chestnuts, whole and sliced, and canned bamboo shoots are not specified in the final list of articles published by the Secretary of the Treasury (T.D. 54521), pursuant to the Customs Simplification Act of 1956, which final list became effective February 27, 1958.

3.   That, at the time of exportation of the merchandise of these appeals to reappraisement, the Foreign Exchange and Trade Control Commission of the Nationalist Chinese Government (Taiwan) had established minimum floor level export prices for canned vegetables, including bamboo shoots and water chestnuts.

4.   That, at the time of exportation on July 30, 1959, canned bamboo shoots, in cases of six cans, 5 pounds each, were freely sold for export to the United States in the ordinary course of trade at $3.50 per case, packed, United States dollars, which price was below the Taiwan floor level export price for bamboo shoots.

5.   That, at the time of exportation on May 31, 1961, canned whole water chestnuts, in cases of six cans, 5 pounds each, were freely sold at $5 per case, packed; canned whole water chestnuts in cases of 24 cans, 20 ounces each, were freely sold at $5.80 per case, packed; and canned sliced water chestnuts, in cases of six cans, 5 pounds each, were freely sold at $5.50 per case, packed; all of such prices in United States dollars and all sales being for export to the United States in the ordinary course of trade and below the Taiwan floor level export prices at the respective dates for such canned whole and sliced water chestnuts.

6.   That the difference between the higher Government-controlled floor level export prices and the lower selling prices of the merchandise of these appeals to reappraisement was paid to the Taiwan Government by the seller out of self-provided foreign exchange, and not by the buyer-plaintiff.

I conclude as a matter of law:

1.   That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of value for appraisement of the canned bamboo shoots and canned water chestnuts, whole and sliced, of these appeals.

2.   That the export value of the bamboo shoots, in six 5-pound packs, of appeal to reappraisement R61/3542, is United States dollars $3.50 per case, packed.

3.   That the export value of the water chestnuts of appeal to reappraisement R61/23312 is United States dollars $5 per case, packed,

for the canned whole chestnuts in six 5-pound packs; and United States dollars $5.50 per case, packed, for the canned sliced water chestnuts in six 5-pound packs.

4. That the export value of the canned whole water chestnuts, in 24 20-ounce packs, of appeal to reappraisement R62/835, is United States dollars $5.80 per case, packed.

Judgment will be entered accordingly.